**In re CHATEAUGAY CORPORATION, Reomar, Inc., The LTV Corporation, et al., Debtors.**

**In re LTV STEEL COMPANY, INC., Debtor.**

**UNITED STATES TRUST COMPANY OF NEW YORK, Plaintiff,**

**v.**

**LTV STEEL COMPANY, INC., Defendant.**

**Bankruptcy Nos. 86 B 11270 to 86 B 11334, 86 B 11402, 86 B 11464(BRL) and No. 86 B 11273(BRL).**

**Adv. No. 92–9581A.**

United States Bankruptcy Court, S.D. New York.

Feb. 1, 1993.

As Amended Feb. 4, 1993.

Kaye, Scholer, Fierman, Hays & Handler, by Myron Kirschbaum, Steven Fox, and Raniero D'Aversa, Jr., of counsel, New York City, for debtors.

Stroock & Stroock & Lavan, Esqs. by Mark Speiser, of counsel, New York City, for Steel Creditors Committee.

Robinson, Silverman, Pearce, Aronsohn & Berman, by Thomas Moers Mayer, Walter H. Curchack, and Mark Risk, of counsel, New York City, for U.S. Trust Co. of New York.

## MEMORANDUM DECISION ON LTV STEEL COMPANY, INC.'S MOTION TO DISMISS AND U.S. TRUST COMPANY OF NEW YORK'S CROSS–MOTION FOR SUMMARY JUDGMENT

BURTON R. LIFLAND, Chief Judge.

This adversary proceeding concerns the interplay between sections 506(b) and 1124 of the Bankruptcy Code, 11 U.S.C. §§ 101–1330 (1993) (the "Code"). U.S. Trust Company of New York ("U.S. Trust"), as successor indenture trustee (the "Indenture Trustee") under a certain Indenture of First Mortgage dated December 21, 1927, between The Youngstown Sheet and Tube Company ("Youngstown") and Bankers Trust Company ("Bankers Trust"), and the twenty-nine (29) Supplemental Indentures thereto (collectively, the "First Mortgage"), seeks a determination by this Court that the allowed, fully secured claims in respect of the bonds issued under and secured by the First Mortgage include: (i) interest on overdue installments of interest, or compound interest, which has accrued during the post-petition period, and (ii) interest computed at the "default" or "post-maturity" rate with respect to one series of bonds, designated as "Series H." Approximately $20,000,000 of post-petition interest is at issue in this adversary proceeding, roughly $19,600,000 of which relates to the issue of post-petition compound interest.

Nearly eight years have passed since I first analyzed, in a trilogy of decisions,[1] the interplay between the Code provisions implicated herein. The intervening period has, of course, produced significant decisions by the Circuit Courts of Appeal, including *Equitable Life Assur. Society v.*

---

1. *See In re Kizzac Management Corp.,* 44 B.R. 496 (Bankr.S.D.N.Y.1984); *In re Manville Forest Prods. Corp.,* 43 B.R. 293 (Bankr.S.D.N.Y.1984); *aff'd in part, rev'd in part,* 60 B.R. 403 (S.D.N.Y. 1986); *In re Forest Hills Assoc.,* 40 B.R. 410 (Bankr.S.D.N.Y.1984).

*Sublett (In re Sublett)*, 895 F.2d 1381 (11th Cir.1990), upon which defendant LTV Steel Company, Inc. ("LTV Steel") places great weight. In addition, the United States Supreme Court decided *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), an important decision with respect to the issues before the Court, not only because the Supreme Court construed section 506(b), but also because the case signaled the Supreme Court's endorsement of the plain meaning doctrine in interpreting provisions of the Code. Nevertheless, many of the principles which guided this Court's earlier decisions retain their vitality today and are relied upon in resolving the issues in the matter at hand.

## I. FACTS [2]

### A. *Background*

On or about July 17, 1986 (the "Petition Date"), LTV Steel and certain affiliates (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Code. Since the Petition Date, LTV Steel has continued in possession of its property and in the management of its business pursuant to 11 U.S.C. §§ 1107(a) and 1108.

Based upon the merger of Youngstown into LTV Steel and pursuant to various supplements to the First Mortgage, LTV Steel is the successor-in-interest to Youngstown and has assumed all of the obligations under the First Mortgage. Pursuant to the twenty-ninth and final supplement to the First Mortgage, U.S. Trust succeeded Bankers Trust as the Indenture Trustee under the First Mortgage.

### B. *The Bonds and Indenture of First Mortgage*

As of the Petition Date, LTV Steel was, and still is, indebted on the following nine (9) series of bonds issued by Youngstown under the First Mortgage:

- The Youngstown Sheet and Tube Company First Mortgage Sinking Fund 4½% Bonds, Series H, due October 1, 1990 (the "Series H Bonds");
- The Youngstown Sheet and Tube Company First Mortgage Sinking Fund 4.60% Bonds, Series I, due 1995;
- The Youngstown Sheet and Tube Company First Mortgage Sinking Fund 10–½% Bonds, Series J, due 2000;
- The Youngstown Sheet and Tube Company First Mortgage Sinking Fund 9⅞% Bonds, Series K, due 1991;
- The Youngstown Sheet and Tube Company First Mortgage Sinking Fund 6–½% Bonds, Pollution Control Series A, due October 1, 1998;
- The Youngstown Sheet and Tube Company First Mortgage Sinking Fund 6–½% Bonds, Pollution Control Series B, due October 1, 1998;
- The Youngstown Sheet and Tube Company First Mortgage Sinking Fund 6–½% Bonds, Series C, due October 1, 1998;
- The Youngstown Sheet and Tube Company First Mortgage Sinking Fund Bonds, Pollution Control Series D, due June 1 2005; and
- The Youngstown Sheet and Tube Company First Mortgage Sinking Fund Bonds, Pollution Control Series E, due June 1, 2006.

(collectively, the "Bonds" and, the holders thereof, the "Bondholders").[3] The Bonds are secured by certain real and personal property of LTV Steel, including, without limitation, LTV Steel's Indiana Harbor plant and facilities, upon the terms and subject to the conditions of the First Mortgage.

LTV Steel was current in making all payments of principal and interest under the Bonds as of the Petition Date. However, effective as of the Petition Date, LTV Steel ceased making payments of principal and interest under the Bonds. No pay-

---

**2.** The facts pertinent to this adversary proceeding are, in the main, undisputed and are derived from U.S. Trust's Complaint dated August 12, 1992 (the "Complaint") and Statement Pursuant to Rule 13(h) of the Southern District of New York Local Bankruptcy Rules.

**3.** The principal amount due under each of the Series and the rate of interest applicable to each Series prior to default or maturity is set forth in Appendix A hereto.

ments under the Bonds have been made by LTV Steel since that time.

Under Article Eight, Section 20 of the First Mortgage, LTV Steel agreed that in the event of a default in the payment of any installment of interest or principal of any of the Bonds, LTV Steel would, upon demand of the Indenture Trustee, pay to the Indenture Trustee, for the benefit of the Bondholders:

> such interest or principal, or both, as the case may be, *with interest upon overdue installments of interest* at the same rates, respectively, as shall be borne by the bonds on which such interest shall be in default; ... and [the Indenture Trustee,] in its own name, and as the trustee of an express trust, shall be entitled to recover judgment therefor and, in case of the pendency of any receivership, insolvency, or bankruptcy proceedings affecting the Company or its property, to file and prove a claim for the whole amount so due and unpaid, with interest as aforesaid.

First Mortgage, Art. Eight, § 20 (emphasis added).

In addition, the Series H Bonds, which would have matured by their terms on October 1, 1990 absent the bankruptcy filing, include a post-maturity interest rate provision, which provides, in relevant part, as follows:

> The Series H Bonds shall mature on October 1, 1990 ... and shall bear interest at the rate of four and one half (4–½) per cent. per annum ... until the Series H Bonds shall have become due and payable *and thereafter at a rate of six per cent. per annum* until the payment of the principal amount thereof.

First Mortgage, Art. One, § 1 (fifteenth supplement) (emphasis added).

### C. *The Proof of Claim, the Litigation and the Adequate Protection Stipulation*

U.S. Trust filed a proof of claim dated November 24, 1987 in the LTV Steel case, on behalf of the Bondholders, with respect to its claim arising under the Bonds in the liquidated sum of $160,097,362.76, plus applicable interest, costs, fees, expenses and charges. In addition, U.S. Trust filed (i) an Application for an Order Prohibiting the Replacement, Removal or Destruction of Collateral and for Relief Pursuant to Section 363(e) and Section 362(d)(1) of the Code (the "Application") and (ii) a Summons and Complaint, each dated October 28, 1987, pursuant to which the Indenture Trustee requested various relief, including, *inter alia*, adequate protection of its security interest under the First Mortgage (the "Summons and Complaint" and, together with the Application, the "Litigation").

LTV Steel opposed U.S. Trust's request for relief and the Litigation ensued. Thereafter, the parties agreed to resolve the Litigation in accordance with the terms and conditions of a Stipulation and Agreement to Provide Adequate Protection and Resolve Certain Controversies, which was approved by Order of the Court dated August 28, 1989 (the "Stipulation").

Pursuant to the Stipulation, LTV Steel agreed that each claim under a Bond would be allowed in full "as a valid, duly perfected, non-voidable, *fully secured* claim under sections 502, 506(a) and 506(b) of the Bankruptcy Code without defense, offset or counterclaim of any kind." Stipulation at 9–10 (emphasis added). LTV also agreed to maintain the collateral for the Bonds at a value no less than $50,000,000 above the amount of the Indenture Trustee's claim, thus assuring that the Bonds would at all times be oversecured and that interest would accrue thereon. *Id.* at 18–21.

Pursuant to the Stipulation, LTV Steel further agreed that the amount of the allowed claim under each Bond would be equal to the sum of:

(a) Such Bond's *pro rata* share of the aggregate outstanding principal amount of indebtedness under all Bonds in such series;

(b) Such Bond's *pro rata* share of the *interest* accrued on all Bonds in such series *as provided for under section 506(b) of the Code;*

(c) Such Bond's *pro rata* share of the aggregate amount of fees, costs and charges incurred by the Indenture

Trustee prior to (and including) the Petition Date; and

(d) Such Bond's *pro rata* share of the aggregate amount of all reasonable fees, costs and charges incurred by the Indenture Trustee after (and excluding) the Petition Date.

*Id.* (emphasis added).

The parties were unable, however, to reach an accord with respect to the two issues before the Court in this adversary proceeding—whether the allowed claim of the Indenture Trustee, on behalf of the Bondholders, includes (a) interest on overdue installments of interest accruing postpetition; and (b) interest computed at the "default" or "post-maturity" rate with respect to the Series H Bonds. The parties expressly reserved their respective rights with respect to these issues pursuant to the Stipulation. Stipulation at 33–34.

### D. *The Debtors' Plan of Reorganization and Disclosure Statement*

On or about February 14, 1992, the Debtors filed their proposed First Modified Joint Plan of Reorganization (the "Plan") and proposed First Modified Disclosure Statement (the "Disclosure Statement"). The Plan provides,[4] *inter alia,* that all fully secured claims against LTV Steel shall be classified as "Class 1.20 Claims." Specifically, section 2.2 of the Plan provides, in relevant part:

Class 1.20 Claims shall consist of fully secured Claims against the Steel Group [which includes LTV Steel], including post-Filing Date interest to the Effective Date to the extent allowable under section 506(b) of the Code (*without any interest attributable to default or penalty rates, which shall be deemed canceled, unenforceable and discharged*),
. . .

Plan at 1–2 (emphasis added).

Article III of the Plan sets forth the treatment of classes of of claims and inter-

**4.** Prior to the issuance of this memorandum decision, on January 19, 1993, the Debtors filed their proposed Second Modified Joint Plan of Reorganization and proposed Second Modified

ests. Specifically, Section 3.1 of the Plan provides, in relevant part:

*Class 1.10, 1.20, 1.40 and 1.50 Claims are not impaired.* . . . [E]ach holder of an Allowed Class 1.10, 1.20, 1.40, 1.50 Claim will be paid (a) the full amount thereof, without interest thereon, in cash on the Effective Date, . . . or the Debtors will take other actions so that the Allowed Claim will not be impaired within the meaning of the Code, or (b) in such amount, at such other date and upon such other terms as may be agreed upon by the holder of such Allowed Claim and the Debtors.

*Id.* at 6 (emphasis added).

The Disclosure Statement echoes the Plan. Specifically, the Disclosure Statement provides:

Each holder of Allowed Class 1.20 Claim will receive payment (a) in full in cash on or about the Effective Date, or the Debtors under this Plan will take other actions so that the Allowed Claim will not be impaired, or (b) as may be agreed upon by the holder of such Allowed Claim and such Debtors. *This Class is unimpaired.*

Disclosure Statement at 28 (emphasis added).

On May 27, 1992, U.S. Trust filed an objection to the Disclosure Statement. In its objection, U.S. Trust takes issue with the Plan's designation of the allowed claim of the Indenture Trustee under the First Mortgage as "unimpaired" under section 1124 of the Code. More specifically, U.S. Trust has asserted that the Disclosure Statement fails to provide "adequate information" because it classifies the Indenture Trustee's allowed claim on behalf of the Bondholders as "unimpaired" while ostensibly not including interest on overdue installments of post-petition interest and interest at the default or post-maturity rate in calculating such claim.

Disclosure Statement. The Second Modified Plan does not materially alter the treatment of the Indenture Trustee's claims.

## II. PROCEDURE

### A. *Motions Before the Court*

On August 12, 1992, U.S. Trust commenced this adversary proceeding against LTV Steel. On September 23, 1992, LTV Steel filed a motion to dismiss U.S. Trust's complaint pursuant to Federal Rule of Civil Procedure ("Fed.R.Civ.P.") 12(b)(6), as made applicable by Federal Rule of Bankruptcy Procedure ("Fed.R.Bankr.P.") 7012(b), for failure to state a claim upon which relief can be granted. LTV Steel asserts that the complaint fails to state a claim because U.S. Trust does not allege and cannot establish the elements legally necessary to support its claims. In particular, the complaint does not allege, with respect to its claim for compound interest, that (i) LTV Steel is solvent, and (ii) that applicable state law, which LTV asserts is the law of the State of New York, permits the enforcement of agreements calling for the payment of compound interest. With respect to the Series H Bonds, LTV Steel asserts that the complaint does not allege that any default under such bonds will not be cured and the debt reinstated under the Plan in accordance with section 1124 of the Code—a fundamental legal prerequisite, according to LTV Steel, to the application of a default or post-maturity rate of interest.

On October 22, 1992, this Court signed a Stipulation and Order permitting the Official Committee of Unsecured Creditors of LTV Steel (the "Steel Committee") to intervene, submit papers, and be heard in this adversary proceeding. On October 27, 1992, the Steel Committee filed a Memorandum of Law in support of LTV Steel's motion to dismiss. The Steel Committee supports the Debtors' position that U.S. Trust's claim for interest on interest fails as a matter of law. With respect to the Series H Bonds, the Steel Committee agrees with the Debtors' position, and adds that this Court may deny the Series H Bondholders post-petition interest at the default rate based upon equitable considerations, as well.

On October 22, 1992, U.S. Trust filed a motion for summary judgment, pursuant to Fed.R.Civ.P. 56(c), as made applicable by Fed.R.Bankr.P. 7056. U.S. Trust's primary argument is that an oversecured creditor's contractual entitlement to compound interest is enforceable in bankruptcy as a matter of *federal law*, pursuant to section 506(b) of the Code, notwithstanding contrary state law. In addition, even assuming state law to be a relevant consideration, U.S. Trust disputes both the governing law and its application. U.S. Trust argues alternatively that either (i) a New York statute enacted into law in 1989—N.Y.General Obligations Law § 5–527—which provides for the enforcement of contractual compound interest provisions, should be applied retroactively to validate the compound interest provision in the First Mortgage, or (ii) Ohio law should be applied to the First Mortgage—which, incidentally, enforces compound interest agreements by statute—under a special choice of law rule known as the "rule of validation."

With respect to the Series H Bonds, U.S. Trust asserts that it is not seeking to recover default interest. Rather, it seeks interest at the post-maturity rate following the maturity of the Series H Bonds during the pendency of the Debtors' case on October 1, 1990. U.S. Trust essentially contends that LTV Steel cannot employ the cure and reinstatement provision of section 1124(2) of the Code to deny the Series H Bondholders their contractual rate of interest following the normal, unaccelerated maturity of their claims.

### B. *The Applicable Standards*

The Court need not set forth the applicable legal standards with respect to the motions before the Court in great detail, because the motions are essentially mirror images of one another, raising entirely the same legal issues.

In ruling on LTV Steel's motion to dismiss for failure to state a claim, the Court must accept U.S. Trust's well-pleaded factual allegations as true. *Allen v. Westpoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991); *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989). Dismissal of the complaint is proper "only if it is clear that no

relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957)).

Summary judgment, on the other hand, is appropriate only if the Court determines that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The Court's role in ruling on a motion for summary judgment "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight*, 804 F.2d at 11.

In accordance with the discussion that follows, LTV Steel's motion to dismiss is granted with respect to the issue of compound interest and denied with respect to the issue of "post-maturity" rate interest on the Series H Bonds. Since, as noted earlier, U.S. Trust's motion for summary judgement is essentially a mirror image of the motion to dismiss, U.S. Trust's cross-motion for summary judgment is denied with respect to the issue of compound interest and granted with respect to the issue of "post-maturity" rate interest on the Series H Bonds.

## III. DISCUSSION

### A. *Interest on Overdue Installments of Post–Petition Interest*

#### 1. *The So–Called "Sublett Test"*

LTV Steel's motion to dismiss Counts I and II of U.S. Trust's complaint, with respect to post-petition interest on interest, is predicated upon U.S. Trust's alleged failure to plead each of the legal requirements necessary to entitle it to the relief it seeks. To establish those legal requirements, LTV Steel relies primarily on the decision of the Eleventh Circuit Court of Appeals in *Equitable Life Assur. Society v. Sublett (In re Sublett)*, 895 F.2d 1381 (1990). In *Sublett*, the Eleventh Circuit heard an appeal from the district court's affirmance of a bankruptcy court decision which, *inter alia*, denied Equitable Life's claim for interest on overdue installments of interest.

LTV Steel asserts that, in the course of rendering its decision, the Eleventh Circuit identified four criteria, each of which has to be met to entitle a secured creditor to interest on interest. These criteria, according to LTV Steel, are: (1) the creditor must be oversecured; (2) the claimed interest must be provided for by the loan documents; (3) the claimed interest must be reasonable under applicable state law; and (4) the debtor must ultimately prove to be solvent. *See Id.*[5]

Whether or not *Sublett*, in fact, establishes a four-prong test,[6] is irrelevant with respect to the motions before the Court. The Eleventh Circuit's decision in *Sublett*, while persuasive in certain respects, is, of course, not binding authority on this Court.

---

5. The *Sublett* Court found, based upon the record before it, that while it appeared Equitable was oversecured and the debtor's estate was solvent, neither of these "outcome determinative factual question[s]" had been expressly answered by and ruled upon by the bankruptcy court. *Id.* at 1384. Consequently, the Circuit remanded the case to the bankruptcy court to make the necessary findings of fact on these "crucial issues" and to draw the appropriate conclusions of law therefrom. *Id.* at 1387.

6. U.S. Trust vigorously disputes that *Sublett* establishes a four-prong test. LTV Steel counters with a citation to an unpublished district court decision from the Middle District of Florida, in which the judge cited to *Sublett* as establishing a four-criteria test for determining whether an oversecured creditor is entitled to post-petition compound interest. *See In re Hillsborough Holdings Corp.*, slip op. at 5 (M.D.Fla. April 29, 1992).

More importantly, apart from *Sublett*, this Court stated what it believed to be the general rule regarding compound interest in *In re Manville Forest Products Corporation*, 43 B.R. 293 (Bankr.S.D.N.Y.1984), *aff'd in part, rev'd in part*, 60 B.R. 403 (S.D.N.Y.1986), wherein I noted that:

> "[t]he bankruptcy rule regarding interest on interest, or compound interest, is that 'where there is a *contractual* provision, *valid under state law*, providing for interest on unpaid instal[l]ments of interest, the bankruptcy court will enforce the contractual provision with respect to both instal[l]ments due before and instal[l]ments due after the petition was filed. *Ruskin v. Griffiths*, 269 F.2d 827, 830–32 (2d Cir.1959), *cert. denied*, 361 U.S. 947 [, 80 S.Ct. 402, 4 L.Ed.2d 381] (1960)....' "

*Id.* 43 B.R. at 300 (quoting *Debentureholders Protective Committee of Continental Investment Corp. v. Continental Investment Corp. (In re Continental Investment Corp.)*, 679 F.2d 264, 269 (1st Cir.), *cert. denied*, 459 U.S. 894, 103 S.Ct. 192, 74 L.Ed.2d 155 (1982)) (hereinafter *"CIC"*) (emphasis added in part).

For the reasons that follow, the Court continues to believe that its decision in *Manville Forest Products* accurately reflects the law with respect to the allowance of compound interest in bankruptcy, notwithstanding the district court's subsequent reversal, in part, which I will also address in the discussion that follows. The Court begins its analysis with the language of the statute and its relationship to applicable state law.

**2. 11 U.S.C. § 506 and the Relationship Between Federal and State Law**

In opposition to LTV Steel's motion and in support of its own summary judgment motion, U.S. Trust argues that federal, not state law, governs the relationship between an oversecured creditor and a debtor, including the allowance of contractual interest on interest, or compound interest. To the extent that section 506 of the Code is the starting point for the Court's analysis, I would agree that federal law governs. *See Toibb v. Radloff,* — U.S. —, —, 111 S.Ct. 2197, 2200, 115 L.Ed.2d 145 (1991) (courts must "look first to the statutory language and then to the legislative history if the statutory language is unclear"); *see also Ron Pair Enterprises*, 489 U.S. at 241–42, 109 S.Ct. at 1030–31.

■ Pursuant to section 506(a) of the Code, a claim secured by collateral is a secured claim to the extent of the value of the collateral, and an unsecured claim for the balance. 11 U.S.C. § 506(a).[7] As a general rule, the Code disallows post-petition interest on unsecured or undersecured claims. *See* 11 U.S.C. § 502(b)(2). Pursuant to section 506(b), however, when a claim is oversecured, i.e., the value of the collateral securing the claim exceeds the amount of the claim, the allowed amount of the secured claim may increase to include *"interest on such claim* and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose." 11 U.S.C. § 506(b) (emphasis added).[8]

---

**7.** Section 506(a) states that:

(a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposi-

tion or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506(a).

**8.** Section 506(b) states that:

(b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506(b).

While section 506(b) of the Code was undoubtedly a significant legislative enactment, in that it codified for the first time pre-Code case law recognizing a limited exception to the general rule of disallowance of post-petition interest in the case of oversecured creditors (*see United Merchants and Manufacturers, Inc. v. Equitable Life Assur. Society (In re United Merchants and Manufacturers, Inc.*), 674 F.2d 134, 138 (2d Cir.1982)), neither the language of section 506(b) nor its legislative history resolves the question of interest on interest, nor does it resolve the question of the allowable *rate* of post-petition simple interest that oversecured creditors should be awarded. *See In re Layman,* 958 F.2d 72, 74–75 (5th Cir.), *reh'g denied,* 964 F.2d 1145 (5th Cir.1992). Congress' apparent decision to defer to state law with respect to the issue of compound interest, as well as the allowable rate of interest which oversecured creditors may recover, is fully consistent with section 506(b)'s legislative history, long-standing bankruptcy jurisprudence concerning the enforcement of state created rights in bankruptcy, as well as the Supreme Court's most recent analysis of section 506(b) in *Ron Pair Enterprises. See* Averch, Collins and Youngman, *The Right of Oversecured Creditors to Default Rates of Interest from a Debtor in Bankruptcy,* 47 Bus. Law. 961 (1992).

As a general rule, the underlying property rights of parties in a bankruptcy case are determined in accordance with applicable state law. *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162, *reh'g denied,* 329 U.S. 833, 67 S.Ct. 497, 91 L.Ed. 706 (1946). *See also In re Chicago, Milwaukee, St. Paul & Pacific R.R. Co.,* 791 F.2d 524 (7th Cir.1986) ("Bankruptcy law provides a federal machinery for enforcing creditors' rights but the rights themselves are created by state law."). *See, e.g., Vienna Park Properties v. United Postal Savings Ass'n (In re Vienna Park Properties),* 976 F.2d 106 (2d Cir.1992) (applying Virginia law to determine the existence of a security interest in rents). Moreover, the Supreme Court has instructed that "[u]nless some federal interest requires a different result, there is no reason why such [property] interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Butner,* 440 U.S. at 55, 99 S.Ct. at 918. *See also Vanston,* 329 U.S. at 161, 67 S.Ct. at 239 (the validity of an obligation "in the absence of overruling federal law, is to be determined by reference to state law"). This Court's holding in *Manville Forest Products* concerning the need to look to applicable state law to determine the interest on interest issue is fully consistent with the foregoing authorities.[9]

---

9. Notwithstanding that the contractual compound interest provision at issue in the *Manville Forest Products* case was invalid under the law of the State of New York at the time, the district court overruled that portion of my decision and held, as a matter of federal law and based upon what it perceived to be the equities of the case, that the oversecured creditors in *Manville* were entitled to recover compound interest, at least where the debtor was wholly solvent, 60 B.R. at 404–05 and n. 1. In support of its holding the district court cited to the First Circuit's decision in *CIC* for the proposition that "federal, not state, law controls post-petition, non-contractual interest awards." *Id.* 60 B.R. at 404. To the extent the district court in *Manville Forest Products* held there is a federally created equitable exception to the general rule concerning the determination of property rights under state law, pursuant to which compound interest may be allowed even if void and unenforceable under applicable state law, the district court's decision appears not to accurately reflect the law on this issue as found by this Court and the Eleventh Circuit in *Sublett. See also In re Chicago, Milwaukee, St. Paul and Pacific R.R. Co.,* 791 F.2d at 532 (7th Cir.1986) (Posner, J.) (decided under Bankruptcy Act) (questioning that portion of the First Circuit's *CIC* decision relied upon by the district court in *Manville,* and declining to award compound interest where Illinois law had a policy of not enforcing compound interest agreements). Moreover, even if such an equitable exception to the general rule exists, and I believe it does not, it would hardly be equitable to invoke the exception here to allow a creditor which is projected to receive the full principal amount of its claim (in cash), plus post-petition interest, to receive interest on that interest as well, in a case where unsecured creditors are projected to recover only a small percentage of their principal in the form of new equity in reorganized LTV.

The legislative history of section 506(b) further supports this Court's conclusion that Congress intended to defer to state law to determine the enforceability of contractual compound interest provisions. The original version of section 506(b) proposed by the House of Representatives provided that the allowed amount of an oversecured creditor's claim may increase to include *"to the extent collectible under applicable law* interest on such claim, and any reasonable fees, costs, or charges provided under the agreement under which such claim arose." H.R. 8200, 95th Cong., 1st Sess. (1977) (emphasis added). The underlined phrase "to the extent collectible under applicable law" was apparently dropped in committee, however. The joint legislative statements with respect to the legislation indicated that the language was dropped because the legislators believed that federal and not state law should govern the enforceability of attorneys' fee agreements under section 506(b). 124 Cong.Rec. H 11,095 (Sept. 28, 1978); S 17,411 (Oct. 6, 1978).

U.S. Trust asserts that the elimination of state law limits on attorneys' fees applies to interest as well. It, therefore, asserts that state law limits on interest, such as prohibitions on compound interest, no longer apply to post-petition interest under section 506(b). Contrary to U.S. Trust's assertions, however, nothing in the legislative history of section 506(b) suggests that Congress intended to make compound interest provisions enforceable as a matter of federal law, notwithstanding contrary state law. Indeed, the Supreme Court in *Ron Pair* analyzed the legislative history of section 506(b) and found it shed no light on the issue of post-petition interest. *See Ron Pair Enterprises,* 489 U.S. at 243 n. 6, 109 S.Ct. at 1031 n. 6.

Finally, this Court's decision is in harmony with the Supreme Court's most recent analysis of section 506(b). In *Ron Pair Enterprises,* a majority of the Court held that the Internal Revenue Service, a statutory, nonconsensual oversecured creditor, and other similarly situated noncontractual oversecured creditors, are entitled to recover post-petition interest under section 506(b). *Id.* at 246–49, 109 S.Ct. at 1033–34. The Court's decision was based on the plain language of the statute.[10] Although the Supreme Court's decision has cast doubt over the continuing vitality of prior decisions entitling contractual oversecured creditors to post-petition interest at the rate provided for in their agreement,[11] the decision itself does not focus on the rights of contractual oversecured creditors, such as the right to compound interest, nor, for that matter, does the decision address the rate of interest to be applied under section 506(b). *See Laymon,* 958 F.2d at 74.

■ The Supreme Court's decision in *Ron Pair* lends further support to the notion that federal courts must look to state law to determine the enforceability of compound interest agreements. By ruling that noncontractual oversecured creditors are entitled to recover post-petition interest under section 506(b), while at the same time remaining silent with respect to the appropriate rate of interest, the Supreme Court implicitly honored its own precedent and Congressional intent to defer to state law limits on interest. *See Butner,* 440 U.S. at 55, 99 S.Ct. at 918; *Vanston,* 329 U.S. at 161, 67 S.Ct. at 239. Consequently, after *Ron Pair,* at least one Circuit Court of Appeals has held that contractual oversecured creditors should be entitled to recover post-petition interest at the rate specified in the contract. *See Laymon,* 958 F.2d at 75.[12] Correspondingly, the rate of

---

**10.** The Supreme Court stated that "[t]he natural reading of [section 506(b) ] entitles the holder of an oversecured claim to post-petition interest and, in addition, gives one having a secured claim created pursuant to an agreement the right to reasonable fees, costs, and charges provided for in that agreement." *Id.* at 241–42.

**11.** See 3 L.P. King, *Collier on Bankruptcy* ¶ 506.05 at 506–46 (15th ed. 1992) (noting the

"uncertainty" created by the Supreme Court's *Ron Pair* decision).

**12.** The Fifth Circuit's view with respect to a contractual creditor's right to accrue post-petition interest at the contract rate under section 506(b) is consistent with the prevailing law prior to the Supreme Court's *Ron Pair* decision, as well as pre-Code law. *See Collier,* ¶ 506.05 at 506–46 (collecting cases).

post-petition interest on noncontractual oversecured claims, such as state tax liens, should be determined by reference to applicable state law. *See, e.g., Lincoln Sav. Bank, FSB v. Suffolk County Treasurer (In re Parr Meadows Racing Ass'n, Inc.)*, 880 F.2d 1540, 1549 (2d Cir.1989), *cert. denied sub nom., Suffolk County Treasurer v. Barr*, 493 U.S. 1058, 110 S.Ct. 869, 107 L.Ed.2d 953 (1990) ("The [county] is also entitled to a priority for postpetition interest, determined under the tax act, on these two claims....").

### 3. Determination of Applicable State Law

In view of the foregoing discussion, the Court must identify the relevant state law and determine whether contractual provisions calling for the payment of compound interest are enforceable thereunder.

This Court has previously recognized that "a federal court sitting in diversity must apply the substantive laws of the state in which it sits, including the choice of law rules of the forum state." *PCH Assoc. v. Liona Corp. N.V. (In re PCH Assoc.)*, 55 B.R. 273, 279 (Bankr.S.D.N.Y. 1985) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)), *aff'd*, 60 B.R. 870 (S.D.N.Y.1986), *aff'd*, 804 F.2d 193 (2d Cir.1986). Thus, this Court must examine the choice of law rules of the State of New York, the forum state.

In the leading case establishing New York's choice of law rule, *Auten v. Auten*, 308 N.Y. 155, 124 N.E.2d 99 (1954), the New York Court of Appeals adopted the "center of gravity" or "grouping of contacts" theory with respect to choice of law issues in contract cases. *Auten*, 308 N.Y. at 160–61, 124 N.E.2d 99. Under this approach, the law of the state "which has the most significant contacts with the matter in dispute" should be applied. *Id.*

■ In applying the "center of gravity" test, this Court notes that, although the First Mortgage contains no choice of law provision, as the First Mortgage was negotiated, written, executed and payable in New York, the applicable substantive law is that of New York. The sole factor possibly supporting application of Ohio law is that Ohio is the state of incorporation of Youngstown, one of the original parties to the agreement. However, the other party to the First Mortgage, the Indenture Trustee, has always been, and continues to be, a New York bank. Under the circumstances, no other state has a closer connection to the execution and performance of the First Mortgage than New York. Therefore, New York law governs the enforceability of the compound interest provision contained in the First Mortgage.[13]

---

**13.** Up until the eve of oral argument, the parties were in apparent agreement that the applicable state law was that of New York. However, in an eleventh hour change of strategy, U.S. Trust asserted for the first time, in a textual footnote contained in their *fourth* submission to this Court, that Ohio law governs. U.S. Trust asserts that, in usury cases, New York courts follow a special choice of law rule known as the "rule of validation," pursuant to which the state law that should be applied from among those states with a connection to the transaction is that law which would uphold enforcement of the contract. *See Speare v. Consolidated Assets Corp.*, 367 F.2d 208, 211 (2d Cir.1966).

Since LTV Steel's motion is brought pursuant to Fed.R.Civ.P. 12(b)(6), the Court examined the allegations of U.S. Trust's Complaint. Interestingly, paragraph 42 of the Complaint states that "[t]he laws of the State of New York [not Ohio] expressly permit the payment of compound interest." Paragraph 43 continues, "Therefore, the Court should enter judgment pursuant to New York General Obligations Law § 5–527...."

Consequently, U.S. Trust's choice of law argument is belied by the allegations of its own complaint, which presumably its counsel drafted.

More importantly, however, any so-called "rule of validation," to the extent one exists, has never been extended beyond the usury context. Furthermore, it appears far from settled that New York courts apply the "rule of validation" *even in usury cases*. The Second Department, the most recent Appellate Division to speak on this issue, has stated that "the Court of Appeals has not articulated a special rule for usury cases. Rather it appears to remain 'the law of the jurisdiction having the greatest interest in the litigation will be applied....'" *A. Conner General Contracting, Inc. v. Rols Capital Co.*, 145 A.D.2d 452, 453, 535 N.Y.S.2d 420, 422 (2nd Dept.1988). In view of the foregoing, this is hardly the Court and this is hardly the case to extend what appears in the first instance to be an unsettled principle of law beyond its original contours.

It is undisputed that up until June 1989 and the enactment of New York General Obligations Law § 5–527, N.Y.Gen.Oblig. Law § 5–527 (McKinney Supp.1992), contractual provisions to pay compound interest, such as the one contained in the First Mortgage, were void as against public policy under New York law. *CIC*, 679 F.2d at 271; *Madison Personal Loan, Inc. v. Parker*, 124 F.2d 143, 145 (2d Cir.1941); *Manville Forest Prods. Corp.*, 43 B.R. at 300–301 n. 6. Nevertheless, U.S. Trust argues that § 5–527, which provides for the enforcement of contractual interest provisions, should be applied retroactively to validate the compound interest provision in the First Mortgage.

▉ U.S. Trust's position is not well-founded. Under settled principles of statutory construction a statute should be applied only prospectively absent clear language directing its retroactive application. *See Thomas v. Bethlehem Steel Corp.*, 63 N.Y.2d 150, 154, 481 N.Y.S.2d 33, 35, 470 N.E.2d 831, 833 (1984) ("An amendment will in general have prospective effect only, unless its language indicates that it should receive a contrary interpretation."); *Kilcommons v. City of New York*, 138 Misc.2d 815, 820, 525 N.Y.S.2d 145, 149 (Sup.Ct.N.Y.Co.1988) ("Remedial statutes should not be given retroactive effect in the absence of clear legislative indication. . . ."), *aff'd*, 144 A.D.2d 1047, 533 N.Y.S.2d 642 (1st Dept.1988), *appeal denied*, 74 N.Y.2d 605, 543 N.Y.S.2d 398, 541 N.E.2d 427 (1989). *See also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988) ("Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result.")

▉ Neither the language of section 5–527 nor its legislative history indicates that it should be retroactively applied. To the contrary, section 5–527 states that "[a] loan or other agreement providing for compound interest *shall* be enforceable." N.Y.Gen.Oblig.Law § 5–527(1) (McKinney Supp.1992) (emphasis added). Moreover, the legislature provided that section 5–527 would become effective on June 24, 1989. McKinney 1989 Session Laws of New York, L.1989, c. 202, § 2. As a general rule, "where a statute directs that it is to take effect immediately, it does not have any retroactive operation or effect." *Murphy v. Bd. of Ed., North Belmore Union*, 104 A.D.2d 796, 797, 480 N.Y.S.2d 138, 139 (2d Dept.1984), *aff'd*, 64 N.Y.2d 856, 487 N.Y.S.2d 325, 476 N.E.2d 651 (1985). Finally, while the materials contained in the Governor's Bill Jacket are far from conclusive, the only common theme that emerges concerning section 5–527 suggests that it was enacted to remedy a perceived business disadvantage for New York financial institutions, and thereby enhance the prospects of such institutions to attract large commercial loans in the future, by allowing them to contract for compound interest. Construing the statute to have retroactive effect would do nothing to further this goal. In sum, the language of the statute and its legislative history do not conclusively establish a legislative intent to apply section 5–527 retroactively. Consequently, at all times relevant to this adversary proceeding, New York law prohibited the enforcement of contractual compound interest clauses.

Based upon the foregoing analysis, as a matter of state law, U.S. Trust is not entitled to an allowance of interest on overdue installments of interest, or compound interest, which has accrued during the post-petition period.[14]

---

**14.** In view of the foregoing, this Court need not reach LTV Steel's argument that the Debtors' admitted insolvency, alone, is sufficient to require the dismissal of the Complaint. The issue of whether compound interest may be prohibited by principles of federal bankruptcy law, notwithstanding state law, remains for another day. *See Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91

L.Ed. 162, *reh'g denied*, 329 U.S. 833, 67 S.Ct. 497, 91 L.Ed. 706 (1946); *Laymon*, 958 F.2d at 75 (noting that "whether the 18% default rate, rather than the 10% pre-default rate should apply in this case must be decided by examining the equities involved in this bankruptcy proceeding"). However, the Court does note that the Eleventh Circuit's rejection of *Vanston* in *Sublett*, appears to be overly broad. *See* Heidt,

## B. *The "Series H" Bonds*

■ In order to resolve the issue of whether the Debtors may unimpair the Series H Bonds under section 1124(2) of the Code, and thereby avoid paying any "default" or "post-maturity" rate interest provided in the First Mortgage, the Court can truncate much of the analysis contained in the preceding section because, unlike contractual compound interest provisions, contractual provisions providing for an increased interest rate on default are enforceable under New York law. *See Citibank, N.A. v. Nyland (CF8), Ltd.*, 878 F.2d 620, 624–25 (2d Cir.1989) (citing *Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir.1959), *cert. denied*, 361 U.S. 947, 80 S.Ct. 402, 4 L.Ed.2d 381 (1960)). The Court will, therefore, turn directly to the interplay between sections 506(b) and 1124 of the Code.

LTV Steel's Chapter 11 filing automatically, by operation of bankruptcy law, accelerated the entire principal amount of each Series of Bonds issued under and secured by the First Mortgage. *See Manville Forest Prods. Corp.*, 43 B.R. at 297. In addition, other courts in this district have recognized that the filing of a proof of claim seeking recovery of the entire principal amount of an unmatured obligation, as U.S. Trust has done here, "could be deemed [an acceleration of the entire principal amount] for purposes of deacceleration." *In re PCH Assoc.*, 122 B.R. 181, 198 (Bankr.S.D.N.Y.1990).

Code section 1124(2) permits the Debtors, however, pursuant to their reorganization plan, to deaccelerate each Series of Bonds, including Series H, "notwithstanding any contractual provision or applicable law,"

provided the Debtors "cure" any defaults and compensate the Bondholders "for any damages incurred as a result of any reasonable reliance by such holder[s] on such contractual provision or such applicable law." 11 U.S.C. § 1124(2).[15] A secured creditor whose claim is treated in accordance with section 1124 of the Code is deemed unimpaired, and is "conclusively presumed" to have accepted the plan, thereby relieving the debtor of any need to solicit an acceptance by that creditor or class of creditors. 11 U.S.C. § 1126(f).

■ This Court has previously ruled that secured creditors treated in accordance with section 1124(2) are not entitled to post-petition default rate interest. Rather, an oversecured creditor should be awarded post-petition interest at the pre-default contract rate. *Forest Hills Assoc.*, 40 B.R. at 415; *Manville Forest Prods.*, 43 B.R. at 298–99. *See* Fortgang and Mayer, *Valuation in Bankruptcy*, 32 U.C.L.A.L.Rev. 1061, 1110–11 (1985). This Court's prior decisions relied upon the Second Circuit's decision in *In re Taddeo*, 685 F.2d 24, 26–27 (2d Cir.1982). In *Taddeo*, the Court of Appeals stated that "[c]uring a default commonly means taking care of the triggering event and returning to pre-default conditions." *Id.; see also Manville Forest Prods.*, 43 B.R. at 298–99; *Forest Hills Assoc.*, 40 B.R. at 416–17; *Kizzac Management Corp.*, 44 B.R. at 500–01. In *Forest Hills Assoc.*, this Court construed section 1124(2) as:

provid[ing] the debtor in distress with the statutory tools necessary to effect a total healing of the scars of contractual

---

*Interest under Section 506(b) of the Bankruptcy Code: The Right, the Rate and the Relationship to Bankruptcy Policy*, 1991 Utah L.Rev. 361, 395–96.

**15.** Section 1124(2) provides that:
(2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—
    (A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title;

    (B) reinstates the maturity of such claim or interest as such maturity existed before such default;
    (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and
    (D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.
11 U.S.C. § 1124(2).

default, by placing the parties into the same position they were in immediately before the default occurred. This healing is accomplished by paying the creditor whatever monies he would have received under the contract had the debtor not defaulted. *Therefore, just as the debtor need not pay the post-default accelerated debt, he need not pay the post-default interest rate on the accelerated debt.* The creditor is, nevertheless, rightfully categorized as unimpaired, for he is returned to the same position he was in immediately prior to the default, and is thereby given the full benefit of his original bargain.

40 B.R. at 415 (emphasis added).

■ U.S. Trust does not question the ability of the Debtors, pursuant to section 1124(2) of the Code and existing case law, to avoid paying the default rate of interest triggered by the bankruptcy filing itself. The parties appear to be in agreement that the Bondholders are entitled to post-petition interest at the contract rate of 4–½% from the Petition Date to October 1, 1990, the date the Series H Bonds would have matured absent bankruptcy. It is the interest component of the Indenture Trustee's allowed claim from October 1, 1990 until the effective date that is in dispute.

U.S. Trust asserts that LTV Steel must pay the Bondholders post-petition interest at the post-maturity rate of 6% from October 1, 1990, in order to unimpair those claims under section 1124. U.S. Trust essentially argues that LTV Steel cannot employ the cure and reinstatement provisions of section 1124(2) of the Code to deny the Series H Bondholders their contractual rate of interest following the normal, unaccelerated maturity of their claims.

As a threshold matter, the Court notes that the Series H Bonds never reached their supposed maturity by virtue of LTV Steel's bankruptcy filing or, alternatively, when the Indenture Trustee filed its proof of claim for the entire principal amount of all of the Bonds, including Series H. Consequently, the October 1990 "maturity date" is somewhat of a "red-herring."

Nevertheless, any "reinstatement" under section 1124(2) can do no more than reinstate an obligation's original maturity. Although the passing of the alleged maturity date of the Series H Bonds during the pendency of one of the longest and most complex bankruptcy proceedings ever filed is somewhat of a fortuitous event, section 1124(2) only allows the Debtors to return the accelerated claims to their original maturity date.

The cases relied upon for support by the Debtors, including *In re PCH Assoc.*, 122 B.R. 181, are simply inapposite. In *PCH*, for example, the debtor was deemed to have cured a default pursuant to section 1124(2) of the Code where it paid past due installments and then prepaid the balance of the debt *in advance of the stated maturity.* Here, of course, the Debtors are seeking to unimpair debt which, absent bankruptcy, would have matured by its terms prior to confirmation.

In view of the foregoing, the Debtors may unimpair the Series H Bonds under section 1124(2) of the Code by providing for the allowance of the Indenture Trustee's claim in full, with post-petition interest at the pre-default contract rate of 4–½% to October 1, 1990, and post-petition interest at the post-maturity rate of 6% from October 1, 1990.[16]

## IV. CONCLUSION

For the foregoing reasons, LTV Steel's motion to dismiss is granted with respect to the issue of compound interest and denied with respect to the issue of "post-maturity" rate interest on the Series H Bonds. Correspondingly, U.S. Trust's cross-motion for summary judgment is denied with respect to the issue of compound interest and granted with respect to the issue of "post-maturity" rate interest on the Series H Bonds.

---

16. The Court's decision with respect to the Series H Bondholders' entitlement to a bump in rate from 4½% to 6% from October 1, 1990 is made as a matter of law, notwithstanding any equitable considerations advanced by the Steel Creditors' Committee, which this Court may take judicial notice of.

The parties are instructed to submit an order consistent with this memorandum decision.

## Appendix A

| Issue | Principal Outstanding as of July 17, 1986 | Interest Rate Effective as of July 17, 1986 * |
|---|---|---|
| Series H | 14,715,000 | $4\frac{1}{2}\%$ |
| Series I | 32,109,000 | 4.60% |
| Series J | 24,000,000 | $10\frac{1}{2}\%$ |
| Series K | 29,900,000 | $9\frac{7}{8}\%$ |
| Series A | 2,745,000 | $6\frac{1}{2}\%$ |
| Series B | 4,405,000 | $6\frac{1}{2}\%$ |
| Series C | 11,005,000 | $6\frac{1}{2}\%$ |
| Series D | 16,500,000 | 9% |
| Series E | 22,000,000 | $8\frac{1}{2}\%$ |
| TOTAL | 157,379,000 | |

* The interest rates listed are without regard to any applicable default or post-maturity rate.