In re NAVIS REALTY, INC., Debtor.

MARC STUART GOLDBERG,
P.C., Plaintiff,

v.

The CITY OF NEW YORK,
et al., Defendants.

Bankruptcy No. 186–61974–352.
Adv. No. 193–1013–352.

United States Bankruptcy Court,
E.D. New York.

March 29, 1996.

Dreyer & Traub, New York City by Marc Stuart Goldberg, P.C., c/o Walter, Conston, Alexander & Green, P.C., New York City, for Plaintiff–Trustee.

Paul Crotty, Corporation Counsel of the City of New York, New York City by Michelle G. Sontarp, for Defendant–New York City Department of Finance.

White & Case, New York City by Allan L. Gropper, for Defendant–Swiss Bank Corporation.

Marc Stuart Goldberg, Dreyer & Traub, New York City, Plaintiff–Chapter 7 Trustee.

## 1000

### DECISION

MARVIN A. HOLLAND, Bankruptcy Judge.

Addressed herein are cross-motions for summary judgment by Swiss Bank Corporation (hereinafter, "Swiss Bank") and the City of New York (hereinafter, the "City"), seeking a determination of priority to proceeds of the sale of the Debtor's real property, and related issues such as the applicable interest rate for purposes of the interest component of the City's tax lien.

### JURISDICTION

Jurisdiction over this matter is conferred by 28 U.S.C. §§ 1334(b), 157(a) and the Order of Referral of Matters to Bankruptcy Judges of this District, 69 Bankr. 186. This is a core proceeding under 28 U.S.C. § 157(b)(2)(K).

### STATEMENT OF FACTS

The material facts are not in dispute.

Navis Realty, Inc., (hereinafter, "Debtor") filed a voluntary petition for reorganization under Chapter 11 of title 11 of the United States Code (hereinafter, the "Bankruptcy Code") on October 10, 1986. By order dated April 30, 1991, the Debtor's case was converted to a case under Chapter 7 of the Bankruptcy Code. Marc Stuart Goldberg, Esq. is the Chapter 7 trustee (hereinafter, the "Trustee").

The Debtor's principal asset consisted of real property located in Staten Island, New York (hereinafter, the "Real Property").

On April 8, 1992, the Trustee sought to abandon the Real Property in accordance with 11 U.S.C. § 554 by serving and filing his "Notice Of Trustee's Intent To Abandon

Property." Swiss Bank objected and the Trustee eventually withdrew his notice to abandon.[1]

On or about November 24, 1992, the Trustee filed a motion seeking to sell the estate's interest in the Real Property. On December 10, 1992, the City filed its response seeking, *inter alia*, an order directing payment of post-petition real estate taxes and related charges, including interest thereon, out of the proceeds of the sale prior to distribution to any other party.

By order dated December 23, 1992 (hereinafter, the "Sale Order"), this Court authorized the sale of the Real Property for $1,750,000, with $400,000 paid at the time of the closing and the balance to be paid pursuant to a twenty year note and mortgage at the rate of 7.5% per annum, fully amortized by March 1, 2013 (hereinafter, the "Sale Proceeds").

The Sale Order provided that the Trustee was "authorized to sell all of his interest in and to the Premises free and clear of all claims, liens and encumbrances, with such claims, liens and encumbrances, if any, to attach to the net proceeds of the sale in the order of their relevant priority[2] . . . ."

Following the sale, the Trustee commenced this adversary proceeding against the City and Swiss Bank to, *inter alia*, determine the extent, validity and priority of certain tax claims by the City.[3] The City timely filed and served an answer with counterclaims claiming entitlement to all of the Sale Proceeds for payment of pre-petition and post-petition real estate taxes and related charges and interest thereon. Swiss Bank claims an interest in the Sale Proceeds by reason of its duly perfected mortgage lien on

---

**1.** According to the City, it did not receive proper notice of the Trustee's intent to abandon the Real Property. Moreover, the City maintains that it did not learn of the Debtor's bankruptcy until July, 1992. Both allegations are disputed by Swiss Bank.

**2.** For purposes of this decision, we have assumed, since no party has urged otherwise, that the "relevant priority" referred to in the Sale Order refers to the priority amongst claims, liens

and encumbrances under the Bankruptcy Code rather than the priority which these items might have enjoyed had the mortgage been foreclosed.

**3.** According to Swiss Bank, the Trustee was holding $778,641.31 in proceeds as of September, 1994. Reply Affidavit Of Allan L. Gropper In Opposition To The Cross–Motion For Summary Judgment Of The City Of New York And In Further Support Of Defendant Swiss Bank's Motion For Summary Judgment, p. 4, ¶ 7.

the Real Property.[4] Finally, the Trustee has an interest in the Sale Proceeds for commissions, attorney fees and disbursements in connection with the sale (collectively, the "Trustee Fees").

### THE CITY'S TAX CLAIMS

The City divides its claim for real estate taxes and related charges into the following four categories:

(i) taxes and other charges [5] (hereinafter, "related charges") that became due pre-petition and interest thereon which accrued pre-petition at the statutory rate (hereinafter, the "Statutory Rate") established by section 11–224(g) of the New York City Administrative Code [6] (hereinafter, the "Administrative Code") in the total approximate amount of $146,975 (hereinafter, the "Pre–Petition Lien Taxes");

(ii) taxes and related charges assessed pre-petition but which became due post-petition on January 1, 1987, and interest thereon in the total amount of $70,040 (hereinafter, the "Post–Petition Lien Taxes");

(iii) taxes and related charges and interest thereon that were assessed and became due post-petition period but prior to the conversion in the approximate amount of $984,876; and

(iv) taxes and related charges and interest thereon that were assessed and became due post-petition and post conversion in the approximate amount of $460,616 (collectively, categories (iii) and (iv) will be referred to hereinafter as the "Post–Petition Taxes").

### THE TRUSTEE'S FEES

On December 23, 1992, Swiss Bank and the Trustee entered into a "Stipulation And Order Authorizing Turnover Of Funds To Swiss Bank And Trust Corporation And Recovery Of Expenses By Trustee And Professionals Pursuant To Section 506(c) Of The Bankruptcy Code" (hereinafter, the "506(c) Stipulation"). The 506(c) Stipulation, which was "so ordered" by this Court on January 9, 1993, provides in relevant part:

NOW, THEREFORE IT IS HEREBY STIPULATED AND AGREED by and between the parties hereto:

2. Upon the closing of the Sale, the Trustee shall deliver to Swiss Bank the Proceeds, less an amount (the "Deposit") to be retained by the Trustee and to be applied toward satisfaction of the Trustee's commissions, compensation to the attorneys for the Trustee and the reimbursement of out-of-pocket expenses, if and when approved by the Court.... In the event the Deposit is insufficient to satisfy the foregoing amounts due to the Trustee such obligation will be satisfied directly by Swiss Bank to the Trustee.

3. The Trustee and his attorneys are authorized to seek compensation and reimbursement of expenses for services rendered in connection with the liquidation of the [Real Property] pursuant to, *inter alia,* Sections 326, 330, 331 and 506(c) of the Bankruptcy Code.

By application dated April 8, 1993, the Trustee's counsel moved for allowance of interim compensation for services rendered and reimbursement of expenses incurred pursuant to the terms of the 506(c) Stipulation. Limited objections were interposed by Swiss Bank and the City and at a hearing on the application, this Court determined that an interim award for compensation and expenses was appropriate. Thereafter, in May of 1993, a second stipulation was entered into between the Trustee, Swiss Bank and the

---

4. According to Swiss Bank, the mortgage was in the principal amount of $3 million and "with interest the debt [to Swiss Bank] now aggregates to more than $6 million." Memorandum Of Law Of Swiss Bank Corporation In Support Of Its Motion For Summary Judgment, p. 2, ¶ 1.

5. These charges include meter, sewer, water and other related charges.

6. Section 11–224(g) of the Administrative Code provides in pertinent part:

No later than the twenty-fifth day of May of each year, the banking commission shall transmit a written recommendation to the council of a proposed interest rate to be charged for nonpayment of taxes on real estate.... In making such recommendations the commission shall consider the prevailing interest rates charged for commercial loans extended to prime borrowers by commercial banks operating in the city and shall propose a rate of at least six per centum per annum greater than such rates....

City under which the City and Swiss Bank consented to payment of $45,960.00 as compensation and $1,222.93 as reimbursement of expenses for the Trustee's counsel. This stipulation was made expressly subject to the outcome of this adversary proceeding as well as the 506(c) Stipulation.

## MOTIONS BEFORE THIS COURT

Swiss Bank seeks summary judgment providing: (i) that all of the Sale Proceeds should be paid to Swiss Bank except that the Trustee may withhold an amount equal to the City's pre-petition tax lien, plus interest thereon at a rate not exceeding the Federal judgment rate [7]; (ii) from the proceeds so withheld, any administrative expenses, including the Trustee Fees, should be paid; and (iii) the surplus, if any, from such withheld proceeds should be paid to the City.

The City seeks judgment declaring that: (i) its Pre–Petition Lien Taxes and Post–Petition Lien Taxes plus post-petition interest thereon and its Post–Petition Taxes should be satisfied out of the Sale Proceeds prior to any payment to Swiss Bank; (ii) the applicable interest rate for all purposes shall be at the Statutory Rates [8]; and (iii) the Trustee Fees be distributed out of the Sale Proceeds pari-passu between the City and Swiss Bank.[9]

Neither party has requested a determination of the precise amount of taxes which are pre-petition and post-petition as such amounts can be readily calculated by the parties.

## DISCUSSION

### I. STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Fed.R.Civ.P. 56(c), made applicable to bankruptcy proceedings by Fed.

R.Bankr.P. 7056, governs motions for summary judgment in the federal courts. The purpose of the motion is to dispose of issues which can be decided upon established, admitted or ascertainable facts without a trial. The court must deny summary judgment where there is a genuine issue as to any material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). On the other hand, summary judgment is "appropriate ... if the Court determines that 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.'" *United States Trust Co. v. LTV Steel Co. (In re Chateaugay Corp.)*, 150 B.R. 529 (Bankr. S.D.N.Y.1993), *aff'd*, 170 B.R. 551 (S.D.N.Y. 1994) (*quoting, Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)).

### II. THE COMPONENTS OF THE CITY'S TAX LIEN

The City asserts that it has a first priority lien for the Pre–Petition Lien Taxes and the Post–Petition Lien Taxes.

With respect to the Pre–Petition Lien Taxes, Swiss Bank concedes that "the City has a valid *pre-petition* tax lien for the principal amount of its pre-petition taxes...." Reply Memorandum Of Law Of Swiss Bank Corporation In Opposition To The Cross–Motion For Summary Judgment Of The City Of New York And In Further Support Of Its Motion For Summary Judgment (hereinafter, "Reply Memorandum Of Law Of Swiss

---

**7.** The Federal judgment rate is computed pursuant to 28 U.S.C. § 1961. According to Swiss Bank, it has been substantially lower since 1986 than the Statutory Rate. Swiss Bank's Statement Pursuant To Local Bankruptcy Rule 22(b), p. 8, ¶ 23.

**8.** According to Swiss Bank, since the Debtor's filing in 1986, the Statutory Rate has been as follows:

16% for the period July 1, 1985 to July 30, 1987; 15.5% per annum from July 1, 1988 to June 30, 1989; 19% per annum from July 1,

1989 to June 30, 1990; 19% per annum from July 1, 1990 to June 30, 1991; 18% from July 1, 1991 to June 30, 1994.

**9.** The Trustee filed an objection to the City's motion in which the Trustee states that he is "wholly supportive of the Swiss Bank Motion and each and every argument raised therein." Objection Of Chapter 7 Trustee To Cross–Motion For Summary Judgment Of The City Of New York, p. 2, ¶ 4.

Bank"), p. 2 (emphasis in original). Swiss Bank also concedes that the City's tax lien includes the principal amount of the pre-petition related charges.[10] Memorandum Of Law Of Swiss Bank Corporation In Support Of Its Motion For Summary Judgment (hereinafter, "Memorandum Of Law Of Swiss Bank"), p. 6.

It is not clear from the documents submitted whether Swiss Bank concedes the validity of the City's tax lien for the Post–Petition Lien Taxes.[11] However, since the Post–Petition Lien Taxes consist of taxes and related charges that became due and payable post-petition, but that were assessed pre-petition, such taxes and related charges constitute part of the City's tax lien. *See Lincoln Sav. Bank, FSB v. Suffolk County Treasurer (In re Parr Meadows Racing Ass'n, Inc.)*, 880 F.2d 1540 (2nd Cir.1989), *cert. denied sub nom., Suffolk County Treasurer v. Barr*, 493 U.S. 1058, 110 S.Ct. 869, 107 L.Ed.2d 953 (1990).

Accordingly, the first component of the City's tax lien is the principal amount of unpaid taxes and related charges which were assessed pre-petition. In addition, since we find that the Statutory Rate is not a penalty

[as set forth below], the pre-petition interest which accrued on these taxes and related charges pursuant to the Administrative Code, constitute the second component of the City's tax lien. Finally, Swiss Bank concedes that the City's tax lien is oversecured [12] and therefore, pursuant to 11 U.S.C. § 506(b) and the Supreme Court's holding in *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), the third component of the City's tax lien is post-petition interest.

The City concedes that it does not have a lien with respect to its Post–Petition Taxes.[13] Rather, they constitute an administrative expense claim pursuant to 11 U.S.C. § 503(b)(1)(B)(i).[14] *See, e.g., In re Mansfield Tire & Rubber Co.*, 85 B.R. 437, 443 (Bankr. N.D.Ohio 1987).

### III. *11 U.S.C. § 724(b)*

■ The starting point for determining the order of distribution of the Sale Proceeds is 11 U.S.C. § 724(b) which provides in pertinent part:

(b) Property in which the estate has an interest [15] and that is subject to a lien that

---

10. Swiss Bank disputes the amount of the related charges which relate to the pre-petition period. Since such charges are not the focus of the motions before this Court and because the parties have not asked this Court to determine amounts in this case, we will leave this dispute to the parties to resolve. If a resolution cannot be accomplished without court intervention, the parties may then take whatever steps they deem reasonable to involve this Court in this dispute.

11. In its discussion regarding the City's tax lien, see Memorandum Of Law Of Swiss Bank, pp. 4–6, Swiss Bank only addresses the Pre–Petition Lien Taxes. We do note, however, that in its calculation of the principal amount of the "City's pre-petition tax claim", Swiss Bank takes into account those taxes for which the "due date [was] 1/1/87". See Memorandum Of Law Of Swiss Bank, pp. 4–5.

12. *See* Reply Memorandum Of Law Of Swiss Bank, p. 2.

13. By section 401 of the Bankruptcy Reform Act of 1994, Pub.L. No. 103–394 § 401, 108 Stat. 4141 (1994), Congress added 11 U.S.C. § 362(b)(9)(D) to the Bankruptcy Code which permits local governments to create or perfect a statutory lien for property taxes which come due post-petition. However, pursuant to section 702

of the Act, section 401 of the Act does not apply retroactively and therefore is not applicable to this case. Pub.L. No. 103–394 § 702, 108 Stat. 4150 (1994). Moreover, wherever we cite to sections of the Bankruptcy Code throughout this decision, we are citing to the Bankruptcy Code as it existed prior to the 1994 amendments.

14. 11 U.S.C. § 503(b)(1)(B)(i) provides in pertinent part:

(b) After notice and a hearing, there shall be allowed administrative expenses ... including—
(1)(B) any tax—
(i) incurred by the estate, except a tax of a kind specified in section 507(a)(7) of this title; ....

Section 507(a)(7) of the Bankruptcy Code concerns property taxes assessed prior to the commencement of a case and therefore, does not apply to the Post–Petition Taxes since they were assessed post-petition. 11 U.S.C. § 507(a)(7).

15. An interesting issue not raised by the parties is whether property in which the estate has no equity can be "[p]roperty in which the estate has an interest" for purposes of 11 U.S.C. § 724(b)(2). We note that similar language is used throughout the Bankruptcy Code in situations where such language cannot be construed

is not avoidable under this title and that secures an allowed claim for a tax, or proceeds of such property, shall be distributed—

(1) first, to any holder of an allowed claim secured by a lien on such property that is not avoidable under this title and that is senior to such tax lien;

(2) second, to any holder of a claim of a kind specified in section 507(a)(1), 507(a)(2), 507(a)(3), 507(a)(4), 507(a)(5) or 507(a)(6) of this title, to the extent of the amount of such allowed tax claim that is secured by such tax lien;

(3) third, to the holder of such tax lien, to any extent that such holder's allowed tax claim that is secured by such tax lien exceeds any amount distributed under paragraph (2) of this subsection;

(4) fourth, to any holder of an allowed claim secured by a lien on such property that is not avoidable under this title and that is junior to such tax lien;

(5) fifth, to the holder of such tax lien, to the extent that such holder's allowed claim secured by such tax lien is not paid under paragraph (3) of this subsection;

(6) sixth, to the estate.[16]

■ The effect of 11 U.S.C. § 724(b) [17] is to subordinate tax liens to priority claims under 11 U.S.C. §§ 507(a)(1)–(a)(6).[18] Thus, under 11 U.S.C. § 724(b), "priority claimants step into the shoes of the tax collector." H.R.Rep. No. 595, 95th Cong., 1st Sess. 382, reprinted in 1978 U.S.Code Cong. & Admin.News at 5787, 5963, 6338. With respect to the priority of other claims, the effect of 11 U.S.C. § 724(b) is "to leave senior and junior lienors and holders of unsecured claims undisturbed." *Id.*

■ Before addressing such claims, it is important to note that the *aggregate* amount of the payments to the holders of the priority claims under 11 U.S.C. § 724(b)(2) cannot exceed the amount of the tax lien.[19] Thus,

as applying *only* to property in which there is equity. For example, 11 U.S.C. § 1129(b)(2)(A)'s cramdown provision provides in pertinent part that a secured creditor in order for a plan to be fair and equitable, must receive deferred cash payments totaling at least the allowed amount of its claim "of a value ... of at least the value of such holder's interest in the *estate's interest* in [the relevent] property." (emphasis added). Clearly, the reference to the "estate's interest" does not limit this provision to property in which there is equity; otherwise cramdown would not be applicable where property is "underwater." Similarly, 11 U.S.C. § 506(a) provides in pertinent part that "[a]n allowed claim of a creditor secured by a lien on *property in which the estate has an interest* ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property. ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim...." (emphasis added). If *"property in which the estate has an interest"* were limited to property in which there is equity, there would be no need for 11 U.S.C. § 506(a)'s bifurcation of claims into secured and unsecured claims as the claim of the creditor secured by a lien on such property would always be oversecured. Finally, we note that 11 U.S.C. § 541 broadly interprets property of the estate to include both legal and equitable interests of the debtor in property. Thus, even where there is no equity in property (and prior to said property being abandoned) the estate at a minimum retains the legal interest. Since 11 U.S.C. § 724(b)(2) does not distinguish between the type of interest necessary for the estate to have an

interest in property, we see no reason to limit property in which the estate has an interest to property in which the estate has an equity interest. Thus, 11 U.S.C. § 724(b)(2) is applicable even where there is no equity in the property to be distributed.

16. 11 U.S.C. § 726 then controls further distribution.

17. For an excellent discussion of the history of 11 U.S.C. § 724(b) see *In re Darnell*, 834 F.2d 1263 (6th Cir.1987).

18. The priority claims designated in 11 U.S.C. §§ 507(a)(1)–(a)(6) are those, respectively, for administrative expenses, certain so-called "gap" claims, wage claims, limited contributions to employee benefit plans, certain claims of grain producers and fishermen, and certain layaway deposits of consumer creditors.

19. We recognize that the language of 11 U.S.C. § 724(b)(2) could be interpreted as providing that *each* holder of a priority claim is entitled to payment in an amount to the extent of the tax lien. Under this interpretation, the total payments made to all priority claimants under 11 U.S.C. § 724(b)(2) could exceed the amount of the tax lien. Such an interpretation, however, is not consistent with the purpose of 11 U.S.C. § 724(b) which is to subordinate the tax lien to the payment of priority claims while leaving undisturbed the priority of senior and junior lienholders vis-a-vis the tax lien. If the aggregate

"the money representing the amount of the tax lien should be set aside. From it, the first [six] priorities under section 507(a) should be paid." 4 *Collier on Bankruptcy* ¶ 724.03 (15th ed. 1993). Moreover, where the aggregate amount of the priority claims exceeds the amount of the tax lien (or where the proceeds to be distributed are not sufficient to pay the total amount of the priority claims to the extent of the tax lien), 11 U.S.C. § 724(c) provides that distribution to each holder of a priority claim shall be made in "the same order as distribution to such holders would have been other than under [11 U.S.C. § 724(b)]." 11 U.S.C. § 724(c).[20] The order of distribution for priority claims in a Chapter 7 case can be found in 11 U.S.C. § 726(b) which provides that payment on such claims shall be made pro-rata among each class of claims. 11 U.S.C. § 726(b). Accordingly, where the aggregate amount of the priority claims under 11 U.S.C. §§ 507(a)(1)–(a)(6) exceeds the amount of the tax lien, such claims would be paid on a pro-rata basis with the total payment on such claims equaling the amount of the tax lien.

■ Turning to the claims in this case, priority claims under 11 U.S.C. § 507(a)(1) include administrative expense claims under 11 U.S.C. § 503(b) [see 11 U.S.C. § 507(a)(1)] which include the City's claim for Post–Petition Taxes. Therefore, somewhat anomalously, the City's claim for the Post–Petition Taxes, for which it does not have a lien, is entitled to share in the distribution of the Sale Proceeds prior to the City's tax lien and the claim of Swiss Bank.

■ In addition, Swiss Bank asserts that the Trustee Fees are administrative expenses and therefore, should be distributed in accordance with 11 U.S.C. § 724(b)(2). Specifically, Swiss Bank maintains that "the Trustee can satisfy his commissions, attorneys fees and disbursements from that portion of the sales proceeds attributable to the City's secured tax lien." Swiss Bank's assertion appears to be based on 11 U.S.C. § 503(b)(2) which provides that administrative expenses include "compensation and reimbursement *awarded under* [11 U.S.C. § 330(a) ]." 11 U.S.C. § 503(b)(2) (emphasis added).[21] The City, however, maintains that pursuant to the stipulations with respect to the Trustee Fees, Swiss Bank consented to the Trustee Fees being satisfied out of the entire amount of the Sale Proceeds. According to the City, "the Trustee's Fees should be satisfied out of the entire amount of the Sale Proceeds and the cost should be shared between the City and the bank on a proportional basis." Affirmation In Support Of Cross–Motion For Summary Judgment By The City Of New York In Accordance With Rule 7056 Of The Federal Rules Of Bankruptcy Procedure And In Response To Swiss Bank And Trust Company's Motion For Summary Judgment (hereinafter, the "Sontarp Affirmation"), p. 15, ¶ 36.

We agree with the City.

First, at a time when Swiss Bank had knowledge of the City's claimed interest in the potential sale proceeds,[22] Swiss Bank en-

payments made under 11 U.S.C. § 724(b)(2) could exceed the amount of the tax lien, then such overpayment would correspondingly reduce the amount that will be paid to junior lienholders under 11 U.S.C. § 724(b)(4) and thereby subordinate the junior lien to the priority claims in a like amount. Such a result is clearly contrary to the purpose of 11 U.S.C. § 724(b).

**20.** 11 U.S.C. § 724(c) states:

If more than one holder of a claim is entitled to distribution under a particular paragraph of subsection (b) of this section, distribution to such holders under such paragraph shall be in the same order as distribution to such holders would have been other than under this section.

**21.** Pursuant to 11 U.S.C. § 330, a court may award reasonable trustee commissions in accordance with the commission schedule set forth in 11 U.S.C. § 326. Under 11 U.S.C. § 326, the Trustee is entitled to commissions for "all moneys disbursed or turned over in the case to parties in interest ... including holders of secured claims." Such commissions are paid under the authority of 11 U.S.C. § 330. Moreover, under 11 U.S.C. § 330, a court may award compensation and reimbursement of expenses for professionals, including professionals retained by a trustee. In the case at bar, it is undisputed that the Trustee Fees include trustee commissions authorized pursuant to 11 U.S.C. § 326 and attorney fees and expenses for the Trustee's counsel.

**22.** As set forth above in the statement of facts, on December 10, 1992, the City filed its response to the Trustee's motion seeking, *inter alia* an order of this Court directing the payment of post-peti-

tered into the 506(c) Stipulation with the Trustee. The provisions of this stipulation constitute Swiss Bank's consent to the payment of the Trustee Fees from the Sale Proceeds and further, expresses Swiss Bank's consent to fund such payment out of the proceeds.

Second, equity mandates that Swiss Bank should, at a minimum, share in the cost of the Trustee Fees. Based on the 506(c) Stipulation, Swiss Bank concedes that the Trustee Fees, which include commissions, attorney fees and expenses, arise from 11 U.S.C. § 506(c) which provides:

> The Trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

11 U.S.C. § 506(c).

■ "Section 506(c) was intended by Congress as a codification of ... the equitable principle that a lienholder may be charged with the reasonable costs and expenses incurred by the ... trustee which are required to preserve or dispose of the property subject to lien to the extent the lien-

holder derives a benefit therefrom." *In re Senior–G & A Operating Co.*, 957 F.2d 1290, 1298 (5th Cir.1992). Put another way, the underlying purpose of 11 U.S.C. § 506(c) is that the secured creditor should pay for the benefit it received. *See In re T.P. Long Chemical, Inc.*, 45 B.R. 278, 279 (Bankr. N.D.Ohio 1985); *see also In re Baum's Bologna, Inc.*, 50 B.R. 689 (Bankr.E.D.Pa.1985). To distribute the Trustee Fees as Swiss Bank requests would thwart the intent of 11 U.S.C. § 506(c) because it would allow Swiss Bank—the only secured party benefitting from the sale of the Property and whose objection to the proposed abandonment resulted in the sale of the Property—to fully escape any participation in the payment of the Trustee Fees, which constitute the reasonable and necessary costs of the sale.[23]

Accordingly, we hold that each party shall share in payment of the Trustee Fees in an amount proportionate to its ultimate recovery.[24]

Thus, pursuant to 11 U.S.C. § 724(b), the following is the distribution and priority scheme for the Sale Proceeds:

1. first, to the Trustee in an amount equal to the Trustee Fees;[25]

City is $250,000 and the total payments to Swiss Bank are $750,000, the Trustee Fees would be multiplied by 25% (250,000/1,000,000) to get the City's share of the payment and by 75% (750,-000/1,000,000) to get Swiss Bank's share of the payment of the Trustee Fees.

---

tion real estate taxes and related charges, including interest thereon, out of the proceeds of the sale prior to any distribution to any other party.

**23.** Swiss Bank's proposed payment scheme for the Trustee Fees suggests an interesting interplay between 11 U.S.C. § 506(c) and the sections of the Bankruptcy Code discussed above: are trustee commissions and attorney fees pursuant to 11 U.S.C. § 506(c) to be made in accordance with the distribution scheme of 11 U.S.C. § 724(b)(2) or do they trump or supersede that section leaving 11 U.S.C. § 724(b) to deal solely with the "net" proceeds from a sale. Stated differently, are commissions and attorney fees pursuant to 11 U.S.C. § 506(c) administrative expenses for purposes of 11 U.S.C. § 724(b)(2)? However, we need not address this issue herein as it has not been raised by either party.

**24.** Thus, as a first step, the total payments to the City and to Swiss Bank should be added together (hereinafter, "total payments"). As a second step, the total payments should be divided by the amount received by each party to get their percentage of the total payments. Third, this percentage should be multiplied by the Trustee Fees to get the proportionate share that each party will be responsible for contributing to the Trustee. As an example, if the total recovery to the

**25.** Although we list these payments as first, the respective amounts that the City and Swiss Bank will contribute to the Trustee Fees cannot be calculated until the payments which would otherwise be made to these parties is determined. *See* footnote 24. The Trustee Fees are to be paid only by the City and Swiss Bank notwithstanding that it appears that there are other administrative claimants in this case. As to Swiss Bank's sharing in the payment of the Trustee Fees, we have set forth the basis for our holding above. As to the basis for the City's sharing in the payment of the Trustee Fees, we merely note that the City maintains that the cost of the Trustee Fees "should be shared between the City and the bank on a proportional basis." Sontarp Affirmation, p. 15, ¶ 36. Accordingly, we need not make a decision as to whether the Trustee Fees are administrative expenses, *see* footnote 23, payment of which would potentially reduce the amount recoverable to other administrative claimants and thereby result in said administra-

2. second, in an aggregate amount equal to the sum of the City's tax lien, payments to the City on account of the Post–Petition Taxes [26] and to any other priority claimants under 11 U.S.C. §§ 507(a)(1)–(a)(6) [27];

3. third, to Swiss Bank.[28]

■■■ Notwithstanding the foregoing distribution scheme mandated by 11 U.S.C. § 724(b), the City maintains that its entire claim for the Post–Petition Taxes should be paid prior to any distribution to Swiss Bank.[29] The City asserts that the Post–Petition Taxes constituted fiduciary obligations of the Debtor and Trustee and since they remain unpaid and are administrative expenses, this Court should exercise its powers under 11 U.S.C. § 105(a) and direct that such taxes be paid prior to payment to Swiss Bank. The City contends that "[s]hould this Court fail to compel the payment of the [post-petition taxes] out of the Sale Proceeds the Bank, a voluntary creditor of the Debtor, will be permitted to receive a windfall at the expense of the City, an involuntary creditor of the Debtor, and will be put in a better position that it otherwise would have been if the Debtor were not in bankruptcy ... [because] the Bank will have successfully avoid-

ed paying in excess of $1,375,000 in [postpetition taxes] ... which could not have otherwise been avoided." Sontarp Affirmation, p. 5, ¶ 12.

Moreover, the City claims that "Congress did not intend for the Bank to receive a windfall at the expense of the City" citing in support the addition of 11 U.S.C. § 362(b)(9)(D) to the Bankruptcy Code as part of the Bankruptcy Reform Act of 1994 which permits liens for post-petition taxes. Sontarp Affirmation, p. 6, ¶ 13.

Further, the City maintains that Swiss Bank played an active role in orchestrating its "windfall" by objecting to the Trustee's to abandonment of the Property and by failing to "fully avail itself of its remedies, as the Bank did not foreclose on the Property, which ... like the abandonment would have resulted in the satisfaction of all the real estate taxes and related charges." Sontarp Affirmation, p. 8, ¶ 18.

Finally, the City maintains that this Court should compel the payment of the Post–Petition Taxes from the sale proceeds prior to payment to Swiss Bank pursuant to 11 U.S.C. § 506(c). In essence, the City maintains that the Post–Petition Taxes were nec-

---

tive claimants sharing in the payment of the Trustee Fees.

**26.** According to Swiss Bank, "[a]t the time of the closing on the sale, the City received $71,336.72 to cover the real estate taxes on the property beginning in the middle of the 1992–93 tax year. In addition, the City received $45,937.50 in transfer taxes and the State of New York received $6,674.00." Swiss Bank's Statement Pursuant To Local Bankruptcy Rule 22(b), p. 4, ¶ 12. The City states that "[u]pon information and belief, the City has not received any payments for real estate taxes due during any period of the 1992–93 tax year ... it appears that those portions of the real estate taxes to which the Bank is referring may have been paid from by the purchaser of the Property to the Trustee." The City's Statement Pursuant To Local Bankruptcy Rule 22(b), p. 2, ¶ 3. If the City received payment from the Sale Proceeds at the closing on the sale for post-petition taxes, such payment would reduce the remaining amount, if any, that the City would otherwise be entitled to recover on its Post–Petition Taxes. However, whether the City received any payment, and from whom such payment was made, are questions of fact that need not be addressed in this decision for summary judgment. Moreover, this appears to

be an issue that the parties are both capable and willing to resolve on their own.

**27.** Pursuant to 11 U.S.C. § 724(c), such payments are to be made to the holder of such claims in the same priority such claims would have outside of 11 U.S.C. § 724(b).

**28.** To the extent, if any, that the amount of the City's Tax Lien exceeds the amount of claims entitled to payment under 11 U.S.C. § 724(b)(2), the City, on account of its Tax Lien, would be entitled to third priority payment in such amount. To the extent that funds remain after payment to Swiss Bank, such funds are to be paid in accordance with 11 U.S.C. §§ 724(b)(5) and (b)(6).

**29.** As set forth above, pursuant to 11 U.S.C. § 724(b), the City technically is not receiving any payment on account of its tax lien. However, the City treats its payment under 11 U.S.C. § 724(b)(2) which is on account of its Post–Petition Taxes as payment on account of its tax lien and seeks additional payment on account of its Post–Petition Taxes. The City essentially seeks payment of its tax lien and Post–Petition Taxes prior to any payment to Swiss Bank.

essary costs and expenses of the sale and that such taxes benefitted Swiss Bank.

While we acknowledge that a bankruptcy distribution in payment of Post–Petition Taxes is different than one under section 11–301 of the City's Administrative Code and that 11 U.S.C. § 362(b)(9)(D) overrules the portion of *Parr Meadows* pertinent to liens for post-petition taxes, we must reject the City's request that we exercise our asserted power under 11 U.S.C. § 105(a) to cause payment of Post–Petition Taxes prior to payment to Swiss Bank.

 Section 105(a) of the Bankruptcy Code provides in pertinent part that a court "may issue any order, process, or judgment that is necessary or appropriate *to carry out the provisions of this title.*" 11 U.S.C. § 105(a) (emphasis added). Thus, this section is to be used to supplement other provisions of the Bankruptcy Code, not to contravene them.[30] Accordingly, 11 U.S.C. § 105(a) should not be used to authorize payment of Post–Petition Taxes in a manner clearly opposite to the statutory mandate of 11 U.S.C. § 724(b).

Moreover, while the City cites the 1994 amendments to the Bankruptcy Code as evidence that Congress did not intend for "the Bank to receive a windfall at the expense of the City", it does concede that the amend-

ments do not apply to cases such as this which were filed before their October 24, 1994 adoption. Therefore, 11 U.S.C. § 724(b), as it existed prior to the amendments, and *Parr Meadows* controls.

Further, there was nothing improper in Swiss Bank's exercising its rights by objecting to the proposed abandonment[31] nor in its refusing to avail itself of its right to seek relief from the automatic stay to foreclose on the Real Property. Nothing compels a secured creditor to act as the City would have liked. On the contrary, based on the rights that 11 U.S.C. § 724(b) provided, not moving for relief from the automatic stay was the course of conduct properly in the best interest of Swiss Bank to follow. For Swiss Bank's counsel to have acted otherwise might well have constituted malpractice.

Finally, we reject the City's assertion that the Post–Petition Taxes are costs and expenses under 11 U.S.C. § 506(c) as there has been no showing that such costs and expenses "directly" benefitted Swiss Bank. *See, e.g., In re Flagstaff Foodservice Corporation,* 762 F.2d 10 (2nd Cir.1985).[32]

While we understand the City's frustration, we have no authority to disregard the clear mandate of 11 U.S.C. § 724(b) by exercising powers that we do not have under 11

**30.** *See Matter Of Fesco Plastics Corp., Inc.,* 996 F.2d 152, 154–55 (7th Cir.1993) where the court stated:

Under [11 U.S.C. § 105(a)], a court may exercise its equitable power only as a means to fulfill some specific Code provision. *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 968, 99 L.Ed.2d 169 (1988); *In re Morristown & Erie R. Co.,* 885 F.2d 98, 100 (3d Cir.1989); see *In re Lapiana* 909 F.2d 221, 224 (7th Cir.1990) ("We deprecate flaccid invocations of 'equity' in bankruptcy proceedings.") By the same token, where a specific Code section addresses an issue, a court may not employ its equitable powers to achieve a result not contemplated by the Code. See *Morristown & Erie,* 885 F.2d at 100; *Levit v. Ingersoll Rand Financial Corp.,* 874 F.2d 1186, 1198 n. 10 (7th Cir.1989); *In re FRG, Inc.* 124 B.R. 653, 659 (Bankr.E.D.Pa.1991).

**31.** We note that the Sixth Circuit Court of Appeals has held that in cases such as this, the tax liens render the property encumbered thereby beneficial to the estate, and not susceptible to

abandonment (even where there is no equity in the property over the liens) because under 11 U.S.C. § 724(b)(2) the estate could recover its administrative expenses out of the proceeds of sale if such property is sold by the trustee. *In re K.C. Machine & Tool Co.,* 816 F.2d 238, 247 (6th Cir.1987).

**32.** *See also C.S. Assocs. v. Miller,* 29 F.3d 903, 906 (3rd Cir.1994) holding that post-petition real estate taxes and related charges were not recoverable under 11 U.S.C. § 506(c) stating that "the City did not meet the requirement that it demonstrate a direct benefit to the secured creditor. Section 506(c) does not contemplate recovery for costs and/or expenses associated with the incidental benefits an entity may receive by virtue of existing within a municipality which provides general services funded by taxes.... Courts have narrowly construed § 506(c) to encompass only those expenses that are specifically incurred for the express purpose of ensuring that the property is preserved and disposed of in a manner that provides the secured creditor with a maximum return...."; *accord, In re Glasply Marine Indus.,* 971 F.2d 391 (9th Cir.1992).

U.S.C. § 105. Nor can we disregard the controlling precedent of *Parr Meadows* or penalize Swiss Bank for following the proper legal course of conduct in this case. Finally, 11 U.S.C. § 506(c) does not apply in this case to the Post–Petition Taxes.

## IV. *THE APPLICABLE INTEREST RATE COMPONENT OF THE CITY'S TAX LIEN*

Having determined priority of distribution of the Sale Proceeds, we must now determine the applicable rate for calculating the interest component of the City's tax lien.

Swiss Bank asserts that "[t]he City's claim for interest on its pre-petition tax claim should be limited to, at most, the Federal judgment rate." Memorandum Of Law Of Swiss Bank, p. 12. Essentially, Swiss Bank maintains that the Statutory Rate or some portion thereof is a disguised penalty and not "true" interest. On the other hand, the City maintains that the applicable interest rate for purposes of its tax lien should be the Statutory Rate.

However, while the parties dispute the applicable tax lien interest rate, neither argument recognizes that there are actually *two* distinct interest components to the City's tax lien, each of which requires its own analysis. The first interest component of the City's tax lien is the pre-petition interest which accrued in accordance with § 11–224 of the Administrative Code; the second is the post-petition interest pursuant to 11 U.S.C. § 506(b).

This distinction is significant in view of Swiss Bank's assertion that the Statutory Rate is a disguised penalty. To the extent that this assertion may be correct, the pre-petition interest component of the City's tax lien would be avoidable under 11 U.S.C. § 724(a). However, as set forth below, with respect to the post-petition interest component, even if the Statutory Rate were a penalty, the City would still be entitled to post-

petition interest, although perhaps at a different rate.

## A. *PRE–PETITION INTEREST*

■ Section 724(a) of the Bankruptcy Code makes liens voidable to the extent they secure claims for certain pre-petition penalties.[33] Therefore, to the extent that the Statutory Rate may be a penalty, that portion of the City's tax lien which is for pre-petition "interest" is avoidable. It is important to note that in contrast to 11 U.S.C. § 506(b) which authorizes the accrual of post-petition interest on the City's tax lien even if it were determined that the Statutory Rate were a penalty (although the rate of interest may be different), there is no similar authorization for awarding pre-petition interest upon such a finding because the sole authorization for pre-petition interest on the City's pre-petition tax claims is the Administrative Code. Thus, as to pre-petition interest, the issue does not really concern the applicable rate of interest to be applied to the City's tax lien, but rather addresses whether the rates set forth under the Administrative Code are true "interest" rates or are disguised "penalty" rates.

To begin, it is helpful to examine former section 57(j) of the now superseded Bankruptcy Act [11 U.S.C. § 93(j) (1976) ] (hereinafter, "section 57(j)"), and some of the decisions which interpreted said section. Section 57(j) provided:

> j. [d]ebts owing to the United States or to any State or any subdivision thereof as a *penalty* or forfeiture *shall not be allowed,* except for the amount of the pecuniary loss sustained by the act, transaction, or proceeding out of which the penalty or forfeiture arose. . . .

> 11 U.S.C. § 93(j), 66 Stat. 424 (1952) (repealed 1979) (original version at Bankrupt-

---

**33.** 11 U.S.C. § 724(a) provides: (a) The trustee may avoid a lien that secures a claim of a kind specified in section 726(a)(4) of this title.

11 U.S.C. § 726(a)(4) provides: (a) Except as provided in section 510 of this title, property of the estate shall be distributed—

(4) fourth, in payment of any allowed claim, whether secured or unsecured, for any fine, pen-

alty, or forfeiture, or for multiple, exemplary, or punitive damages, arising before the earlier of the order for relief or the appointment of a trustee, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the holder of such claim; . . . .

cy Act of 1898, ch. 541, § 57(j), 30 Stat. 561) (emphasis added).

The purpose of section 57(j) was "to protect general creditors against reduction of their dividend by reason of penalties ... owing by the bankrupt to the United States or any state or subdivision thereof." 3 *Collier on Bankruptcy* ¶ 57.22(1) (14th ed. 1974). Section 724(a) of the Bankruptcy Code "continue[s] the policy behind Section 57j ... of protecting unsecured creditors from the debtor's wrongdoing...." 4 *Collier on Bankruptcy* ¶ 724.02 (15th ed. 1993). Not surprisingly, "[t]he crucial and most litigated problem in connection with § [57j] naturally [was] to determine whether or not a particular debt should be classified as a 'penalty' and therefore disallowed." 3 *Collier on Bankruptcy* ¶ 57.22(2) (14th ed. 1974).

The Second Circuit Court of Appeals addressed this problem in *In re Beardsley & Wolcott Mfg. Co.*, 82 F.2d 239 (2d Cir.1936), where the city of Waterbury, Connecticut filed a claim for pre-petition real estate taxes, together with statutory interest. The district court had rejected the interest items on the ground that they really were penalties that could not be allowed under section 57(j). The district court so held because in certain situations Connecticut's statutes imposed a lower rate of interest upon delinquent taxes than was imposed by the statute applicable to the taxes in the case before it. *Beardsley*, 82 F.2d at 240. In particular, the statute in question provided that interest would accrue on delinquent taxes at the rate of 9% per annum in certain situations and at the rate of 7% per annum in others.[34] In addition, a related statute provided for a complete exemption from interest charges in certain situations. It was from the rejection of the claim for "interest" that an appeal was taken.

In reversing the district court and holding that the 9% "interest" per annum was not a penalty, the Court of Appeals gave great deference to the state legislature as it speculated as to the reasons for the differences between the statutory rates. The Court of Appeals stated:

It seems unlikely that the rate of 7 per cent. fixed under the Connecticut laws where a lien for taxes has been continued by the collector is an indication that the higher rate of 9 per cent. is a penalty. *In the face of a statute which denominates each percentage interest, it is more reasonable to assume that the Legislature fixed each rate as fair compensation for delay and expense occasioned by the nonpayment of the taxes under particular circumstances.*

*Beardsley*, 82 F.2d at 240 (emphasis added).

The Court further pondered:

*Perhaps the difference* between the rate of 9 per cent. fixed by statute upon arrears of taxes during the first two years after a tax has become due and the lower rate of 7 per cent. fixed where the lien is continued arose because of the belief that if a municipality should be unable to raise money for its expenses owing to a sudden failure of taxpayers to meet their obligations during a financial depression the expense of raising funds in an emergency would represent a larger loss to the city than would be the case where taxes had remained longer in arrears and the budget had become accommodated to the old arrears.

*Id.* at 241 (emphasis added).

Finally, the Court of Appeals proposed:

*It may be* that the higher rates of 9 per cent. or 7 per cent. which delinquents who do not obtain an exemption have to pay was fixed through a rough estimate of the

---

34. The statute in question, section 380c of 1931–1933–1935 Supplement to Connecticut Statutes, pp. 145–146, effective June 5, 1935, provided for interest on delinquent taxes and stated in part that:

The delinquent portion of any tax shall be subject to interest at the rate of three-fourths of one per cent for each month ... which shall elapse from the time when it shall have become due and payable until the same shall be paid; provided, if the lien for any real estate tax, unpaid in whole or in part, was or shall be continued by certificate under the provisions of any past or present general statute or public or special act, interest, for such part of the total period as shall elapse from the date of such continuance to the date of payment, shall be charged at the rate of seven percent per annum....

*Beardsley*, 82, F.2d at 239.

loss to the municipality occasioned by the indulgence to those in "unusual financial" circumstances.

*Id.* (emphasis added).

Most significant, the Court of Appeals stated:

> But we are not concerned with the wisdom of the statute. The rates fixed under the taxation and police powers of the state were doubtless governed by mixed financial and social policies. The policies were matters for the Legislature, and if it declared any rate which was within the range fixed as compensation for the use of money by private agreement and denominated it "interest," we think there should be every presumption that it was such in fact.

*Id.* (emphasis added).

According to the Court of Appeals, its decision in *Beardsley* was mandated in part by the 1924 Supreme Court decision in *United States v. Childs,* 266 U.S. 304, 45 S.Ct. 110, 69 L.Ed. 299 (1924), where the Supreme Court, in reversing an earlier Second Circuit Court of Appeals decision, *In re J. Menist & Co.,* 290 F. 947 (2d Cir.1923), held that "interest" at the rate of 1% per month upon delinquent federal income taxes was interest and not a penalty. In *Childs,* the Collector of Internal Revenue had filed a claim against the trustee in bankruptcy "in the sum of $2,421.75, plus 5% penalty and 1% interest per month thereon until paid." *Childs,* 266 U.S. at 306, 45 S.Ct. at 110. Pursuant to section 57(j), the Government withdrew its claim for 5% penalty but urged its claim for 1% interest per month.

The Supreme Court, in addressing the same issue now confronting us stated:

> At the outset we are confronted with the difference between penalty and interest. A penalty is a means of punishment; interest a means of compensation. Bouvier defines it to be "a consideration paid for the use of money or for forbearance in demanding it when due." This Court had declined to give it peremptory definition. . . .

*Childs,* 266 U.S. at 307–08, 45 S.Ct. at 111.

The Supreme Court noted:

The imposition of a tax is certainly a function of government and creates an obligation, and the power that creates the obligation can assign the measure of its delinquency—the detriment of delay in payment; and [the tax statute in question that imposed the interest] has done so in this case, and explicitly done so.

*Id.* at 308, 45 S.Ct. at 111.

In reversing the Court of Appeals, the Supreme Court rejected the reasoning of that court which "considered that the 1% was involved as well, as being in effect penalty and not saved by its name, though it was imposed by the legislature and within the legislative power, and notwithstanding that taxes are treated as debts within the meaning of the Bankruptcy Act." *Id.* Significantly, the Supreme Court expressly rejected the reasoning of the Court of Appeals which had stated that:

> There being no evidence of any injury or damage to the Government by the withholding of this tax except that which flows from the nonpayment of a just debt, anything in excess of the legal rate of interest is to be treated as a penalty and not allowed.

*Id.* (emphasis added).

The Supreme Court then stated:

> The federal statute is precise, and it is made peremptory by the distinction between "penalty" and "interest", and if it may be conceded that the use of the latter word would not save it from condemnation if it were in effect the former, it cannot be conceded that 1% per month—12% a year—gives it that illegal effect, certainly not against legislative declaration that is within the legislative power, there being no ambiguity to resolve.

*Id.*

Thus, the Supreme Court held:

> The tax in this case is one on income; a burden imposed for the support of the Government. Interest is put upon it and so denominated, distinguished from the 5% as penalty, clearly intended to compensate the delay in payment of the tax—the detriment of its non-payment, to be continued

during the time of its non-payment—compensation, not punishment. *Id.*[35]

Following *Childs*, the Supreme Court revisited the interest/penalty issue in *Meilink v. Unemployment Reserves Commn. of California*, 314 U.S. 564, 565–66, 62 S.Ct. 389, 390–91, 86 L.Ed. 458 (1942), where the trustee in bankruptcy was indebted to the California Unemployment Reserves Commission for contributions which had accrued under a state unemployment statute which provided "that an employer who failed to make the payments required of him by the Act 'shall become additionally liable for interest on such payments at the rate of twelve per cent per annum.' " The trustee argued that any rate above 6% per annum was a penalty relying in part, on the fact that "Article XX, § 22 of the California Constitution, which [provided] that, except for specified institutions, the rate of interest on loans, and on accounts after demand or judgment, shall be seven per cent...." *Meilink*, 314 U.S. at 566–67, 62 S.Ct. at 391. The Supreme Court in rejecting the trustee's argument and holding that the "interest" of 12% under the statute was not a penalty but was indeed interest for purposes of section 57(j) stated:

> It is common knowledge that interest rates vary not only according to the general use value of money but also according to the hazard of particular classes of loans. Delinquent taxpayers as a class are a poor credit risk; tax default, unless an incident of legitimate tax litigation, is, to the eye sensitive to credit indications, a signal of

distress. A rate of interest on tax delinquencies which is low in comparison to the taxpayer's borrowing rate—if he can borrow at all—is a temptation to use the state as a convenient, if involuntary, banker by the simple practice of deferring the payment of taxes. Another variable is the amount necessary to compensate for the trouble of handling the item. The legislature may include compensation to the state for the increased costs of administration in the exaction for delay in paying taxes without thereby changing it from interest to penalty.[36]

*Id.*

The Supreme Court further stated in support of its holding that in accord with *Childs*, "we must give credit to a state legislature acting within its Constitutional sphere like that accorded to Congress [in *Childs* ] acting in its Constitutional sphere." *Id.* at 569–70, 62 S.Ct. at 392.

■ The cases cited above establish that where: (i) the statute in question denominates the rate at issue as "interest", (ii) such rate is within the range fixed as compensation for the use of money by private agreement, and (iii) such rate is not combined in any manner with a specified penalty, great deference will be given the legislative body that enacted the particular statute. *See also, Horn v. Boone County, Nebraska*, 44 F.2d 920, 921–22 (8th Cir.1930) ("It will be observed that the interest extracted on delinquent taxes is no greater than the interest allowed by agreement in the state of Nebras-

---

**35.** In *Childs* the Supreme Court distinguished its earlier decision in *New York v. Jersawit*, 263 U.S. 493, 44 S.Ct. 167, 68 L.Ed. 405 (1924) where the statute in question required that "every domestic corporation" must "annually pay in advance ... an annual franchise tax" upon its net income for the year next preceding, and provided that, if the tax were not paid, the corporation should pay "in addition to the amount of such tax ... ten per centum of such amount, plus one per centum for each month the tax ... remains unpaid." *Childs*, 266 U.S. at 309, 45 S.Ct. at 111. The Supreme Court in *Jersawit* held that the 10% plus the additional one percent per month were a penalty and therefore disallowed under section 57(j), "not only because the one per centum was 'more than the value of the use of the money' but because it was added by the statute to the 10% to

make a single sum and 'must be treated as part of one corpus and must fall with that.' " *Id.*

**36.** As it did in the *Childs* case, in *Meilink* the Supreme Court distinguished its decision from its earlier decision in *Jersawit* noting that:

> Here the exaction computed according to lapse of time is not lumped together with another percentage computed without reference to lapse of time; here the exaction is denominated interest by the statute, and there it was not; and we cannot be so confident here that twelve per cent "is more than the value of the use of the money," or of the validity of the implied major premise that an exaction in excess of such value cannot be merely an interest charge. *Meilink*, 314 U.S. at 569, 62 S.Ct. at 392.

ka. We think, therefore, there would be no justification in holding the provision for 10 per cent. on delinquent taxes a penalty as distinguished from interest for the use of money."); *In re Davison,* 106 B.R. 1021, 1022 (Bankr.D.Neb.1989) (in the context of 11 U.S.C. § 506(c) and the appropriate post-petition interest rate, the court stated: "I conclude that the interest rate imposed [by the state statute] do (sic) not provide for a penalty. The rate charged is reasonable and it is imposed over time ... Accordingly, the state statutory interest charges should be given force and effect in bankruptcy proceedings....").

We have found no case, nor has Swiss Bank cited any, which would detract from the precedential value of the above cases even in the context of 11 U.S.C. § 724(a).

Swiss Bank does however cite the decision rendered by the district court in *Parr Meadows,* where the court in construing Suffolk County's tax act observed that debts owed to a government unit cannot be recovered in a Chapter 7 case "unless the amount owed reflects an actual pecuniary loss." *In re Parr Meadows Racing Association, Inc.,* 92 B.R. 30, 37 (E.D.N.Y.1988), *aff'd in part, rev'd on other grounds,* 880 F.2d 1540 (2nd Cir.1989), *cert. denied,* 493 U.S. 1058, 110 S.Ct. 869, 107 L.Ed.2d 953 (1990) (*citing, Simonson v. Granquist,* 369 U.S. 38, 82 S.Ct. 537, 7 L.Ed.2d 557 (1962)). Swiss Bank correctly notes that the district court in *Parr Meadows,* relying on *Simonson v. Granquist,* concluded:

> ... that allowance of ... penalties "would serve not to punish the delinquent taxpayers, but rather their entirely innocent creditors." [*citing, Simonson v. Granquist* ]. The County cannot establish that these penalties represent an actual pecuniary loss. Assessment of penalties therefore would needlessly deprive [the bank] and the other secured creditors of monies that they would otherwise recover to compensate for their actual pecuniary losses suffered as a result of the bankruptcy. *Parr Meadows,* 92 B.R. at 38.

However, in contrast to the case before us, in *Parr Meadows,* Suffolk County had contended that it was entitled to a "5% penalty

for late payment of each years taxes" in addition to "interest of 1% per month on the taxes and penalties." *Id.* at 32. Thus, the tax statute at issue in *Parr Meadows* contained an express penalty provision over and above its interest provision. Moreover, Suffolk County did not dispute that the "5% penalty" was in fact a penalty but argued that it was entitled to that penalty pursuant to 11 U.S.C. § 506(b).

Here, the rate at issue under the Administrative Code is denominated as "interest". Thus, we are not faced with a taxing authority which seeks payment on account of a penalty which is expressly denominated as such. Accordingly, this case is factually distinguishable from *Parr Meadows.* Moreover, the statements cited above by the district court in *Parr Meadows,* in addition to being dicta, were made by the court solely in its discussion regarding the "5% penalty". *In fact, with respect to the "1% interest per month", the district court, in dicta, focused not on whether said "interest" was a penalty but rather on whether the "interest" was allowable under 11 U.S.C. § 506(b).*

We therefore hold that the Statutory Rate does not represent a penalty. The Administrative Code denominates the Statutory Rate as "interest" and such rate is not combined in any manner with an additional penalty. Moreover, in contrast to a true penalty which generally is a one time charge added to principle, the Statutory Rate continues to accrue until the underlying debt is satisfied—a characteristic of interest. Most importantly, however, we find the Statutory Rate for the years in question to be within "within the range fixed as compensation for the use of money by private agreement". *Beardsley,* 82 F.2d at 241. While Swiss Bank asserts that the Statutory Rate[s] were excessive, we note that under § 11–224 of the Administrative Code the Statutory Rate is derived from written recommendation from the City's banking commission, which is directed to "consider the prevailing interest rates charged for commercial loans *extended to prime borrowers by commercial banks* ... [and] the proposed rate shall be *at least* six percent per annum greater than such prevailing prime rate." Six percent above the

rate charged by commercial banks to their prime borrowers does not strike this Court as penalizingly excessive.

In so holding, we are in accord with *Beardsley,* where as we noted above, the Court stated that "[t]he rates fixed under the taxation and police powers of the state were doubtless governed by mixed financial and social policies ... [t]he policies were matters for the Legislature, and if it declared any rate which was within the range fixed as compensation for the use of money by private agreement and denominated it "interest," we think there should be every presumption that it was such in fact." *Beardsley,* 82 F.2d at 241. In finding that the Statutory Rate is reasonable and not excessive we are mindful of the statement in *Meilink,* set forth above in its entirety, that "interest rates vary not only according to the general use value of money but also according to the hazard of particular classes of loans [and] [d]elinquent taxpayers as a class are a poor credit risk; tax default, unless an incident of legitimate tax litigation, is, to the eye sensitive to credit indications, a signal of distress." *Meilink,* 314 U.S. at 567, 62 S.Ct. at 391. Thus, in the marketplace, it is the quality of the borrower, not that of the lender, that sets the appropriate interest. Moreover, we wonder what interest rate Swiss Bank would have charged the debtor in this case knowing it had not and could not pay its taxes assuming that Swiss Bank would have even granted the debtor a loan under such circumstances.

To the extent that our holding might appear to conflict with the district court opinion in *Parr Meadows,* we merely reiterate that this case is factually distinguishable. Obviously, were we presented with the facts of *Parr Meadows,* the taxing authority would not receive the presumption to which the City is entitled in this case. Moreover, we note that with respect to the claimed "interest" in *Parr Meadows,* while the district court held that such interest was not allowable under 11 U.S.C. § 506(b) it did so on the language of that section *and did not address whether the "interest" was a penalty.*[37]

Finally, with respect to the issue of whether the Statutory Rate is a penalty, we conclude by addressing Swiss Bank's remaining assertions.

First, Swiss Bank maintains that Suffolk County's 5% penalty in *Parr Meadows* is "directly analogous to the 6% additional amount included in the City's statutory rate." Reply Memorandum Of Law Of Swiss Bank, p. 4. We disagree. In *Parr Meadows,* the tax act clearly distinguished between the 5% penalty and the 12% per annum interest. Moreover, the 5% penalty was in addition to a prevailing reasonable rate of interest at the time. In this case, to equate the "6% above prime" with the 5% penalty would result in a conclusion that the reasonable "interest" rate under the Administrative Code was equal to the prime rate. Such a conclusion is unwarranted: a delinquent taxpayer cannot be

---

**37.** A case that combines some of the aspects of *Parr Meadows* with the factual aspects of this case is *In re Ross Nursing Home,* 2 B.R. 496 (Bankr.E.D.N.Y.1980). In that case, Suffolk County, New York—as it did in the *Parr Meadows* case—sought payment of a five percent penalty and interest at the rate of one percent per month on delinquent real property taxes. With respect to the five percent penalty, the Court in *Ross Nursing Home,* held, as the district court in *Parr Meadows* did, that the penalty was not based upon a pecuniary loss suffered by Suffolk County. Therefore, the court held that the penalty was not allowed under Section 57(j) of the Bankruptcy Act. As to the "interest" claimed by Suffolk County, the *Ross* Court initially noted that "the most convenient cloak for penalties is the term 'interest,' and ... excessive interest must be treated as a penalty and disallowed under section 57(j)." *Ross,* 2 B.R. at 499. Moreover, the court stated that "[w]hether a particular rate of interest is excessive is a question of fact." *Id.* Final-

ly, the court held that based on "prevailing conditions in ... money markets", "[i]t cannot be said that the interest charges claimed by the county are excessive". *Id.* Thus, with respect to the "penalty" claim, the *Ross* Court did as the district court in *Parr Meadows* did in placing the burden on the county to establish that the "penalty" represented actual pecuniary loss stating, "the county suggests no reason to believe that the five percent charge is based upon pecuniary loss suffered by the county." *Id.* at 498. However, as to the "interest" claim, the *Ross* Court deferred to the county once it determined that the rate charged was not "excessive". From the published decision, it does not appear that the county was required to present evidence concerning its pecuniary loss from the nonpayment of the real property taxes. Rather, the *Ross* Court merely compared the "interest" rate charged with market rates and then determined that the "interest" rate was not excessive and therefore was not a penalty.

compared to a borrower entitled to the prime rate. Most significant, however, as we noted above, the 5% penalty in Parr Meadows was, as are almost all penalties, a one-time charge, whereas the 6% above prime is a continuing charge, similar to interest. Finally, there is nothing unusual in the banking industry about interest being fixed at a stated percentage above "prime".

Second, Swiss Bank contrasts the Statutory Rate with *1994* bond rates on certain of the City's bonds. Notwithstanding that there is no mention as to what such bond rates were during the periods in question, we question whether Swiss Bank really is proposing that rates above the City's borrowing rates are necessarily penalties rather than compensation for pecuniary loss. Were we to accept this argument, it thereafter could be utilized against banks whose business it is to charge more on loans than it pays its depositors. Stated differently, if the "spread" between what the City charges as interest on delinquent tax obligations and the rate at which it could borrow is, as Swiss Bank would have us hold, by definition a "penalty", such reasoning should not be limited to taxing authorities but should then also apply to banks.

Nevertheless, we do not find the City's bond rates to be relevant to the issue at hand. Swiss Bank essentially argues that if the City could borrow at (for example) 5% per annum then the Statutory Rate is a penalty because the City could recoup its loss from the non-payment of taxes by borrowing funds at 5% per annum. To take this argument to its extreme would mean that if the City had a budget surplus in any given year, *any* amount of interest it charged on unpaid tax obligations would by definition be a penalty because in such circumstances there would be no loss to the City.[38] In addition, political considerations must also be taken into account with respect to this argument. That is, for this argument to hold, it must be assumed that the City could borrow whenever it needs funds and that the reason the City needed to borrow had no bearing upon

the rate of interest it would have to pay—issues which have implications far beyond the scope of this decision. Moreover, the bond rate would not be a true reflection of the City's loss resulting from the non-payment of taxes because if large numbers of taxpayers failed to pay taxes, the cost of borrowing would skyrocket. Finally, over-reliance upon the City's borrowing rate would inappropriately give Swiss Bank the benefit of the artificially depressed interest rate enjoyed only by governments and their agencies due to the fact that interest thereon is not taxable.

For the reasons set forth above, we hold that the Statutory Rate is not a penalty. Accordingly, the City's tax lien may include interest which accrued pre-petition at its Statutory Rate.

## B. *APPLICABLE POST–PETITION INTEREST RATE*

 Having determined that the Statutory Rate is not a penalty, we must determine the applicable interest rate allowable for purposes of post-petition interest on the City's tax lien pursuant to 11 U.S.C. § 506(b).

Section 506(b) of the Bankruptcy Code provides in pertinent part:

(b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506(c).

In *Ron Pair*, the Supreme Court held that post-petition interest is allowable under 11 U.S.C. § 506(b) on an oversecured nonconsensual lien. It failed, however, to address the rate at which interest should accrue under that section. Moreover, "neither the language of [11 U.S.C. § 506(b) ] nor its legislative history resolves the question … of the allowable rate of post-petition simple interest

---

**38.** Loss being measured by the cost to the City in having to borrow to replace the unpaid tax obli-

gations.

that oversecured creditors should be awarded. *Chateaugay*, 150 B.R. at 538. Accordingly, even after *Ron Pair*, the issue of the allowable rate of interest that a creditor is entitled to accrue on its oversecured claim under 11 U.S.C. § 506(b) still remains. *See In re Greensboro Lumber Co.*, 183 B.R. 316 (Bankr.M.D. Georgia 1995) ("Neither the language of section 506(b), its legislative history, nor *Ron Pair* resolves the question of the allowable rate of post-petition interest on an oversecured claim.").

The City maintains that since the Bankruptcy Code does not dictate an appropriate rate of interest, this Court must look to applicable non-bankruptcy law to determine the appropriate rate. Swiss Bank maintains that the appropriate interest rate should be the federal judgment rate. In support of its position, the City cites *Chateaugay* and *E & C Holding Co. v. Township of Piscataway*, 164 B.R. 477 (Bankr.D.N.J.1944).

In *Chateaugay*, the issues before the court were whether the allowed oversecured claim of an indenture trustee, on behalf of certain bondholders, included under 11 U.S.C. § 506(b): (i) interest on overdue installments of interest accruing post-petition, and (ii) interest computed at the "default" or "postmaturity" rate with respect to a certain series of bonds. *Chateaugay*, 150 B.R. at 531.

Discussing the enactment of 11 U.S.C. § 506(b) and the fact that neither the language or the legislative history of that section resolves the question of interest on interest or the question of the allowable rate of simple interest to be awarded thereunder, Judge Lifland stated that "Congress' apparent decision to defer to state law with respect to the issue of compound interest, as well as the allowable rate of interest which oversecured creditors may recover, is fully consistent with section 506(b)'s legislative history, long-standing bankruptcy jurisprudence concerning the enforcement of state created rights in bankruptcy, as well as the Supreme Court's most recent analysis of section 506(b) in *Ron Pair Enterprises.*" *Id.*

With respect to *Ron Pair*, Judge Lifland stated:

... *Ron Pair* lends further support to the notion that federal courts must look to

state law to determine the enforceability of compound interest agreements. By ruling that noncontractual oversecured creditors are entitled to recover post-petition interest under section 506(b), while at the same time remaining silent with respect to the appropriate rate of interest, the Supreme Court implicitly honored its own precedent and Congressional intent to defer to state law limits on interest. [citations omitted]. Consequently, after *Ron Pair*, at least one Circuit Court of Appeals has held that contractual oversecured creditors should be entitled to recover post-petition interest at the rate specified in the contract. *See [In re] Laymon*, 958 F.2d [72] at 75. n. 12 [ (5th Cir.1992) ] *Correspondingly, the rate of post-petition interest on noncontractual oversecured claims, such as state tax liens, should be determined by reference to applicable state law. See, e.g., Lincoln Sav. Bank, FSB v. Suffolk County Treasurer (In re Parr Meadows Racing Ass'n, Inc.)*, 880 F.2d 1540, 1549 (2d Cir.1989), *cert. denied sub nom., Suffolk County Treasurer v. Barr*, 493 U.S. 1058, 110 S.Ct. 869, 107 L.Ed.2d 953: (1990) ("The [county] is also entitled to a priority for post-petition interest, determined under the tax act, on these two claims....").

*Chateaugay*, 150 B.R. at 539 (emphasis added).

The City cites *E & C Holding* for the following statement made by the court therein:

The debtor and Natwest argue that if Piscataway is entitled to interest on postpetition taxes, it should be computed at the federal judgment rate or a market rate. Piscataway argues that it is entitled to interest at the higher statutory rate authorized by N.J.S.A. 54:4–67. The court concludes that since the Bankruptcy Code does not specify the interest rate for postpetition taxes, the interest rate provided by applicable nonbankruptcy law applies. In this case that is the rate authorized by N.J.S.A. 54:4–67.

*E & C Holding*, 164 B.R. at 481.

Swiss Bank asserts that *E & C Holding* has no application in a Chapter 7 context

where penalty claims are expressly disallowed and asserts that the City's reliance on the dicta in *Chateaugay* is "misplaced".[39] Reply Memorandum Of Law Of Swiss Bank, p. 9.

While it is true that the statement quoted above by Judge Lifland was dicta insofar as it related to oversecured nonconsensual liens, this does not detract from its persuasive reasoning that a bankruptcy court should defer to state law with respect to the allowable rate of interest which oversecured creditors may recover.

However, a number of courts have held that "[e]ven if a secured claim arises by operation of state law and the state statute imposes a predetermined rate of interest ... the Bankruptcy Court is not necessarily bound by the rate of interest imposed by the state statute." *In re DeMaggio*, 175 B.R. 144, 148 (Bankr.D.N.H.1994); *accord, In re Kalian*, 178 B.R. 308, 312 (Bankr.D.R.I. 1995). In *DeMaggio*, the court noted that "[t]he Bankruptcy Code is the 'genesis of an oversecured creditor's entitlement to interest ... regardless of the source of the lien' [*quoting, In re Kelton*, 137 B.R. 18, 20 (Bankr.W.D.Tex.1992]. The Bankruptcy Court accordingly may exercise some degree of discretion in determining the appropriate rate of postpetition (sic) interest on an oversecured claim." *DeMaggio*, 175 B.R. at 148.

Similarly, in *In re Lapiana*, 909 F.2d 221 (7th Cir.1990), the Court of Appeals held that a bankruptcy court has the power to abate an award of post-petition interest on an oversecured tax claim. Nevertheless, in that case, the Court of Appeals affirmed the district court, which held that the bankruptcy court had abused such power, finding that "[t]he Treasury bill rate plus three percent is generous, but not princely...." *In re Lapiana*, 909 F.2d at 224.

■ We agree that for purposes of post-petition interest on an oversecured tax claim pursuant to 11 U.S.C. § 506(b), a bankruptcy court is not absolutely bound by the interest rate set forth in the non-bankruptcy tax statute. However, as a general rule, a bankruptcy court should be reluctant to deviate from the statutory rate and should do so only in the following two situations as described below.

■ First, it is appropriate to award post-petition interest at a rate other than a statutory rate for purposes of 11 U.S.C. § 506(b) where the statutory rate is a penalty. *See Galveston Independent School District v. Heartland Federal Savings and Loan Association*, 159 B.R. 198 (S.D.Tex.1993) (the court in rejecting the claim that 11 U.S.C. § 506(b) allowed interest only at either the federal judgment rate or the market rate and awarding interest at the statutory rate, held "that nonconsensual oversecured creditors also receive the rate of interest dictated by the statutes under which their liens arise, provided the charge can be reasonably characterized as true interest rather than as a penalty."); *see also, In re Davison*, 106 B.R. 1021, 1022 ("I conclude that the county is entitled to be paid the statutory rate of fourteen per cent, unless the court determines that the statutory rate constitutes a penalty." [*citing, Meilink v. Unemployment Reserves Commn. of California* and *Horn v. Boone County, Nebraska* ]). As we have held above, the Statutory Rate is not a penalty.

39. Specifically, Swiss Bank asserts that while Judge Lifland cited to *Parr Meadows* for its statement that "[t]he [county] is also entitled to a priority for post-petition interest, determined under the tax act ...", in support of his belief that the "rate of post-petition interest on noncontractual oversecured claims ... should be determined by reference to applicable state", *Chateaugay*, 150 B.R. at 540, "the county did *not* receive the full amount of its post-petition charges ... under its tax act." Reply Memorandum Of Law Of Swiss Bank, p. 4 (emphasis in original). However, Swiss Bank misunderstands both Judge Lifland's quote set forth above as well as the *Parr Meadows* statement cited therein. Judge Lifland was speaking about *interest* and similarly, the language which he quotes *Parr Meadows* for also concerned *interest*. While Swiss Bank asserts that the statement by Judge Lifland was not complete because the county in *Parr Meadows* did not receive all of their charges under the "tax act", Swiss Bank fails to recognize that the only charges not recovered under *Parr Meadows* was the *penalty* claims, not the *interest* on the tax claims. Thus, the quote from *Parr Meadows* cited by Judge Lifland, correctly stands for the proposition for which he cited it—that the post-petition interest to which Suffolk County was entitled to a priority was to be determined under the tax act.

Second, even where a statutory rate is not a penalty, there may be times when equity mandates deviation therefrom. While we have found no Chapter 7 case—and Swiss Bank concedes that it has found none—where the court reduced a statutory rate based on equitable grounds, we note that a number of courts in post-*Ron Pair* Chapter 11 cases have, on equitable grounds, refused to apply a taxing authority's statutory rate under 11 U.S.C. § 506(b) and have instead applied the federal judgment rate. Not surprisingly, Swiss Bank cites two such cases—*Wasserman v. City of Cambridge*, 151 B.R. 4 (D.Mass.1993) and *In re Kelton*, 137 B.R. 18 (Bankr.W.D.Tex.1992)—in support of its motion.

In *Wasserman*, "[t]he sole issue presented [was] the appropriate rate of post-petition interest to be applied to the real estate tax claims of the City of Cambridge." *Wasserman*, 151 B.R. at 5. The City of Cambridge (hereinafter, "Cambridge") claimed that the applicable interest rate was the Massachusetts statutory rate of 16%. The Chapter 11 debtors objected to this rate and claimed that the applicable rate should be the federal judgment rate. The Bankruptcy Court held in favor of Cambridge. On appeal, the district court reversed, stating:

> One of the principal objectives of the bankruptcy laws is to achieve the equitable distribution of an estate's assets among all creditors [citations omitted]. To that end, a court's job is to determine the rate of post-petition interest that will treat all creditors most fairly. To make that determination, a court must examine the equities and determine the post-petition interest rate in light of the facts of the particular case [citation omitted].
>
> *Wasserman*, 151 B.R. at 5.

The court further noted that "[i]n the present case, in addition to [Cambridge], there are unsecured creditors who have claims on the Debtor's assets." *Id.* The court noted that there was a "high likelihood ... that the unsecured creditors [would] not be repaid in full [and] [t]he extent of their losses ... will depend on whether priority claims, like the tax claim, are entitled to the statutory rate of post-petition interest or the federal judgment

rate in this case." *Id.* Finding that the statutory rate would "cause the unsecured creditors a direct harm by diminishing the value of the estate", the district court held that "[c]onsequently, it would be inequitable to the unsecured creditors to impose the higher, statutory rate." *Id.* at 6.

In addition to the plight of the unsecured creditors, the district court was concerned with the impact of the statutory rate upon the debtors "fresh start", noting that "[a]nother central objective of bankruptcy is to give the debtor a fresh start ... [a]t 16%, the statutory rate is overinflated and comes up far short of that mark." *Id.* The court based its decision that the statutory rate was "overinflated" and it "no longer reflects current market rates" on the fact that the statutory rate had been in place unchanged since 1979, or for *approximately 14 years prior to the court's decision.* The court noted that since 1979, interest rates in general had "relaxed dramatically". *Id.*

Thus, *Wasserman* holds that the statutory rate failed "to provide the right balance between the interests of the creditors and debtors in [that] case" and that "[b]y contrast, the federal judgment rate treats these interests more evenly." *Id.* Accordingly, the district court held that "the most equitable interest rate is the federal judgment rate." *Id.*

In addition to *Wasserman*, Swiss Bank cites the case of *Kelton*, a Chapter 11 case where the bankruptcy court held that the City of El Paso, Texas was not entitled to the statutory rate of interest on its oversecured tax lien for real estate taxes. *Kelton*, 137 B.R. at 21. Instead, the court held on equitable grounds that the applicable rate was the federal judgment rate. *Id.* A significant portion of the court's reasoning was based on the court's decision in *In re Laymon*, 117 B.R. 856 (Bankr.W.D.Tex.1990), where the court ruled that the federal judgment rate applied when computing an oversecured creditor's entitlement to post-petition interest under 11 U.S.C. § 506(b). Thus, the Court in *Kelton* stated:

> As this court observed in *Laymon*, "the use of the federal rate yields an 'equitable solution' to the competing claims of the

secured and unsecured creditor that also honors the principle of applying federal law to the payment of post-petition interest."

*Id.* at 20.

Significantly, however, *Laymon* was REVERSED by the Fifth Circuit Court of Appeals. *In re Laymon,* 958 F.2d 72 (5th Cir. 1992), *reh'g denied, reh'g en banc denied, cert. denied,* 506 U.S. 917, 113 S.Ct. 328, 121 L.Ed.2d 247 (1992). The persuasiveness of *Kelton* is thus diluted. Nevertheless, we address *Kelton* because Swiss Bank cites it and because the holding in that case ultimately was based on its reasoning that:

> If the state statutory rate were to be applied here, the oversecured creditor would receive a larger portion of the estate's pie, contrary to the equitable distribution scheme contemplated by the Bankruptcy Code, ultimately undermining the uniformity of bankruptcy laws nationwide.

*Id.* at 21.

The City maintains that the public policy or equity concerns relied upon by the courts in *Wasserman* and *Kelton* in reducing the taxing authority's statutory interest rate are not applicable in the instant case. We agree.

First, this is not a case like *Wasserman* where the court found that the statutory rate would "cause the unsecured creditors a direct harm by diminishing the value of the estate" and therefore "it would be inequitable to the unsecured creditors to impose the higher, statutory rate." *Wasserman,* 151 B.R. at 6. In the present case, the interest of unsecured creditors is not an issue; the only party that would benefit from a reduction in the Statutory Rate would be Swiss Bank. In fact, we note that applying the Statutory Rate could actually result in a greater distribution to unsecured priority claimants because it would increase the amount of the City's tax lien (as compared to utilizing a lower rate of interest) and thereby increase the fund available to priority claimants under 11 U.S.C. § 724(b)(2).

Moreover, this case is distinguishable from *Wasserman* because we need not concern ourselves with the Debtor's "fresh start" since this a corporate Chapter 7 case.[40] Further, unlike *Wasserman* where the court found the statutory rate "overinflated", we have already held that the Statutory Rate is reasonable.

In contrast to *Wasserman,* the court in *In re Building Technologies Corp.,* 167 B.R. 853 (Bankr.S.D.Ohio 1994), addressed a situation factually similar to the case at bar. There the court stated:

> In its motion for summary judgment, plaintiff raises a question about the interest rate to be applied post-petition to tax claims by the City and Ralls County upon which a lien arose pre-petition. Plaintiff does not dispute that the City and Ralls County are entitled to interest post-petition on such claims, but does place in issue the propriety of charging interest at the rate of 18%, that provided by the Missouri property tax statute. Plaintiff asks that post-petition interest on pre-petition tax obligations be allowed only at the federal judgment rate.
>
> . . .
>
> In *Wasserman,* the court determined that the federal tax rate should be used, because there would be a distribution to unsecured creditors, and in order to do fairness to all creditors, the court concluded that the statutory rate should be reduced.
>
> The facts of the instant case are entirely different.
>
> There will be no distribution to unsecured creditors. *The only distributee from the estate will be SPBC, which holds a secured claim far in excess of any possible resource of this bankruptcy estate. In those circumstances, we see no reason why this creditor should be allowed to deprive the tax claimants of their statutory due.*
>
> Accordingly, summary judgment on the objection of plaintiff to the statutory inter-

---

**40.** 11 U.S.C. § 727 states, in pertinent part,:
(a) The court shall grant the debtor a discharge, unless—

(1) the debtor is not an individual; . . . .

est rate on pre-petition tax claims will be denied.

*Building Technologies Corp.,* 167 B.R. at 858–59 (emphasis added).

We concur. We find further support for this holding because the present case—in contrast to the Chapter 11 cases of *Wasserman* and *Kelton*—is a Chapter 7 case where proceeds from the sale of property are to be distributed in accordance with 11 U.S.C. § 724(b). As described above, 11 U.S.C. § 724(b) subordinates a tax lien to certain priority claims. Given the fact that the City is already being forced to subordinate its tax lien—a situation not present in the Chapter 11 cases—we would be hard pressed to find an "equitable" basis to *further* reduce the potential recovery the City could receive in this case.

As to the interest rate on non-consensual liens, ours is to preserve delicate equilibrium within which state and federal legal systems coexist rather than upset it. Absent clear and compelling necessity to do otherwise, we must look to state law. We can see no overwhelming necessity for forcing a federal judgment rate upon that which is neither a federal judgment nor devoid of existing, appropriate state procedures for determining a suitable interest rate.

Accordingly, since the Statutory Rate is not a penalty and since we do not find an "equitable" basis to reduce the Statutory Rate, we hold that the City is entitled to post-petition interest under 11 U.S.C. § 506(b) at the Statutory Rate.

The City shall settle an appropriate order consistent with the foregoing upon two weeks notice within thirty days.